UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 91-3612

CONCISE OIL & GAS PARTNERSHIP,
AUSTRAL OIL COMPANY, INC. and
ENERGY CONSULTANTS, INC.,

Plaintiffs-Appellants,
Cross-Appellees,

versus

LOUISIANA INTRASTATE GAS
CORPORATION,

Defendant-Appellee,
Cross-Appellant.

_____

Appeals from the United States District Court for the
Eastern District of Louisiana
_____

(March 18, 1993)

Before POLITZ, Chief Judge, and SMITH and BARKSDALE, Circuit
Judges.

BARKSDALE, Circuit Judge:

This appeal turns on sufficiency of the evidence challenges to a $50-million jury verdict, concerning a long-term contract to purchase natural gas. The verdict for the plaintiff-sellers was based on fraud during one period of the contract and breach of contract during another; but the district court set aside the fraud portion. Both sides appeal, raising almost countless issues. We **AFFIRM**, except with respect to the prejudgment interest calculation, and **REMAND** for that limited purpose.

## I.  FACTS AND PROCEDURAL HISTORY

Concise Oil & Gas Partnership, Austral Oil Company, Incorporated, and Energy Consultants, Inc. (EnCon; all three collectively referred to as Sellers) are producers of natural gas from the Montegut Field (the Field) in Terrebonne Parish, Louisiana.  They own 62 1/2% of the gas produced from that field; the remainder is owned by Goldking Production Company (now DeNovo Oil & Gas, Inc.; hereinafter Goldking).  In November 1977, Louisiana Intrastate Gas Corporation (LIG) contracted for a 20-year term to purchase the Sellers' share of the gas produced in the Field (Contract 495).[1]  Goldking was designated the Sellers' Representative "for all purposes" under the contract.  And, Goldking had its own contract to sell its gas from several fields, including from the Field, to LIG (Contract 493), which contained provisions similar to those in Contract 495.

Item 3 of the contract governs price.[2]  Item 3(a) establishes a base price, and provides for annual increases, if the price is not otherwise redetermined.  Item 3(b) gives the Sellers the right to have the price redetermined under certain conditions, while 3(c) states the method.  Item 3(d) gives LIG the right to have the price redetermined if economic conditions indicate a significant downward change in the value of gas to LIG, but provides that the redetermined price "shall not be less than such prices then being

---

[1]     The original Contract 495 sellers were EnCon, GS Oil & Gas Co., and Cenard Oil & Gas Co.  Concise acquired Cenard's interest in 1988; Austral, GS's in 1985.

[2]     Item 3 is reproduced in the Appendix.

paid by [LIG] to ... producers [in Terrebonne and contiguous parishes -- St. Mary, LaFourche, and Assumption] for similar gas ...." Item 3(e) states that if any state or federal law makes "all or any portion of Item 3(c)" illegal or inoperative, the parties will meet and mutually determine a price for each anniversary date, and provides for termination by either party if they are unable to agree. And, Item 3(f) provides that if "any state or federal law, rule or regulation establish[es] a ceiling price for the gas sold under this Contract, then in such event, Seller shall receive the maximum price allowed by such law, rule or regulation".

The contract contains a "take-or-pay" provision: LIG must either purchase 80% of the gas produced in the Field each day, or pay for any deficiency. And, LIG must take not less than 60% of that 80% each month.

Production began in May 1978; that November, the Natural Gas Policy Act of 1978 was enacted.[3] Accordingly, that December, Goldking (the Sellers' representative) informed LIG that it interpreted Item 3(f) to require a price increase. After evaluating the request, LIG agreed in August 1979 that the Sellers were entitled to receive the price established under § 102 of the NGPA. But, LIG pointed out that the NGPA imposes an obligation to refund if it is later determined that the price paid exceeds the "maximum lawful ceiling price". LIG paid the § 102 price from January 1979 until March 1983.

---

[3] *See Pennzoil Co. v. Federal Energy Regulatory Comm'n*, 645 F.2d 360, 367 (5th Cir. 1981), *cert. denied*, 454 U.S. 1142 (1982).

Effective March 1983, LIG sought a price reduction, based on the "substantial reduction in market demand due to a downturn in the United States economy"; and the Sellers agreed. Accordingly, from March 1983 through November 1987, the prices were governed by letter agreements.

In December 1987, the Sellers discovered that LIG was paying higher prices to other producers in Terrebonne and contiguous parishes than it was paying them. Therefore, they requested a price redetermination pursuant to Items 3(b) and (c); but LIG refused to furnish information regarding the prices it was paying those other producers. After 1987, and throughout this litigation, LIG continued to purchase the Sellers' gas, remitting payment through Goldking.

Austral, one of the Sellers, filed suit against LIG in Texas state court in December 1988; and Concise, another of the Sellers, filed this action in federal court in Louisiana in January 1990. Shortly after EnCon, the remaining Seller, intervened in 1990 in the Texas proceeding, the federal court compelled the joinder of Austral and EnCon in this action.

The Sellers claimed, *inter alia*, that LIG breached the contract by failing to pay the contract price after March 1983; and that, in addition, LIG fraudulently obtained the consent of the Sellers and their representative, Goldking, to reduced prices from March 1983 through November 1987. They sought the difference between the price paid and the contract price, with interest; a declaratory judgment as to the validity of the contract; and

specific performance.  LIG counterclaimed for overpayment from 1979 through 1984.

At the trial in early 1991 (evidence presented in six days), the jury, through interrogatories, found against LIG on its counterclaim; and found that it both defrauded the Sellers from late March 1983 through November 1987 (approximately $26 million)[4], and breached the contract from December 1987 through trial (approximately $23 million).  The district judge expressed concern about the verdict when it was returned.

On post-trial motions, the district court denied the Sellers' requests for declaratory judgment and specific performance, and granted only part of the requested prejudgment interest.  LIG moved for judgment notwithstanding the verdict, a new trial, or a remittitur.  For the fraud award (March 1983 - November 1987), the district court granted JNOV, but conditionally granted a new trial. It denied JNOV for breach of contract (December 1987 - date of trial).

## II.  ISSUES

As noted, although many claims, facts, documents, lengthy time periods, extremely large damage claims, and complex and technical data, legal terms, and terms of art were in issue, the evidence was presented in six days, due in large part to the timely and consistent rulings by the district judge, many *sua sponte*.  Here, the parties raise almost every issue imaginable, many of which are

---

[4]    For this period, as discussed *infra* in Part II.E.2., the court did not submit a breach of contract claim.

without merit and do not require discussion.  The significant issues are addressed below.

As also noted, sufficiency of the evidence challenges are at the heart of this case.  Our JNOV review is governed by the well-known standard from *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence -- not just that evidence which supports the non-mover's case -- but in the light and with all reasonable inferences most favorable to the party opposed to the motion.  If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.  On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... A mere scintilla of evidence is insufficient to present a question for the jury.... However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id*. at 374-75.

### A.  Fraud

Consistent with the JNOV, our review of the record reveals only a mere scintilla of evidence of fraud.  We need address only one of the requisite elements for fraud, defined in Louisiana as

> ... a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction.

- 6 -

La. Civ. Code art. 1953 (West 1987). Accordingly, the jury was instructed that fraud is the (1) intentional misrepresentation or suppression of *material* facts made by one party to another, (2) with knowledge of their falsity, (3) with the intent to induce the other party to rely on the misrepresentation and act on it, (4) reliance on the false information, and (5) injury as a result of that reliance. The Sellers had the burden of proving each element by a preponderance of the evidence, La. Civ. Code art. 1957; insufficient evidence for any element sustains the JNOV.

As stated, an essential element of the fraud claim was proof that LIG intentionally misrepresented or concealed *material* facts. The district court held that such proof was lacking, because the Sellers were more interested in "takes" than prices. We agree.

The contract required LIG to either take or pay for a certain amount of the gas produced daily from the Field, and to take part of that daily requirement on a monthly basis. In the months leading up to LIG's first request for a price concession in March 1983 -- the start of the period for which fraud is charged -- the takes had been decreasing. At one point, the Sellers' wells were shut-in for about 45 days, because LIG told Goldking that it could not take the gas.

In fact, there was a shortage of takes during 1980-1984, and considerable evidence that the Sellers were concerned about maintaining them. Ripple (LIG) testified that LIG had a shortage of takes for contract years 1980 through 1984, and that increased takes in later years were intended to make up for prior deficient

takes.  Corcoran (LIG) testified that he told Goldking that, if it did not accept LIG's price, LIG would reduce takes under the contract.  And, Johnson (LIG) testified that Goldking agreed to reduce the price in return for increased takes.  In a written summary of a January 1985 meeting with the Sellers, Speyrer (Goldking) stated that "the consensus was not concerned with price, however, but with takes".  And, he admitted that a higher price might not be as economically advantageous as having more gas purchased at a lower price.  It was his understanding that, without some price adjustment, LIG would reduce takes considerably.  On the other hand, however, he testified that LIG offered only one price -- there was no option to instead have reduced takes at a higher price.  Mealy (Goldking) testified that Goldking did not expect to be able to move significant volumes of gas if it did not reduce the price, and that producers had to "take what they could get".  Carter (Goldking) testified that the producers wanted to assure that takes would be maintained at the level provided for in the contract, but that LIG was unwilling to bargain on price.  According to Carter, the lowered price was dictated by LIG, and Johnson (LIG) did not say that contractually-required takes could be maintained without the demanded price concession.  But, Cantrell (EnCon) testified that the Sellers were interested in both takes and price, and conceded that they agreed to reduce the price in order to move the gas.

We are most mindful of a court's properly circumscribed role in reviewing a jury verdict.  This notwithstanding, based upon our

- 8 -

review of the record, as discussed in part above, the evidence supports only one conclusion: the Sellers agreed to reduce the price in order to keep the gas flowing.  Therefore, LIG's alleged misrepresentation that the Sellers were receiving its "best" price, and its failure to disclose its payment of higher prices to other producers in the contract area are not material.  The Sellers could have insisted that LIG honor the contractually-required levels of takes at a higher price but, instead, they preferred to sell more of their gas at reduced prices.  Because reasonable jurors could not have found that LIG misrepresented or concealed *material* facts, we affirm the JNOV for fraud.[5]

### B.  Contract

### 1.  Termination

The district court denied JNOV for breach of contract for the period December 1987 through trial.  LIG contends that the breach claims should not have been submitted to the jury, asserting that the contract terminated at the end of November 1987, when the parties failed to mutually agree on a price after expiration of the last pricing agreement.

LIG maintains that whether an enforceable contract existed is a question of law; and it is well-settled, of course, that interpretation of an unambiguous contract is indeed an issue for the court.  *E.g., **Rutgers, State University v. Martin Woodlands Gas***

---

[5]     Therefore, it is not necessary to consider the other elements of fraud; LIG's contentions that rescission was not available, the fraud claims had prescribed, and Concise lacked standing; or the conditional grant of a new trial on the fraud claims.

*Co.*, 974 F.2d 659, 661 (5th Cir. 1992).  But, it is equally well-settled that whether the parties' conduct constitutes a breach "presents a pure question of fact that the trier of fact alone may decide".  *Turrill v. Life Ins. Co. of North America*, 753 F.2d 1322, 1326 (5th Cir. 1985).  LIG's termination contention is premised on its claim that a January 31, 1985, letter agreement referring to Item 3(e) applied to the contract and the subsequent price redeterminations.  The applicability of the letter agreement was a question of fact properly submitted to the jury.

The Sellers' gas was deregulated effective January 1, 1985, pursuant to the Natural Gas Policy Act.  NGPA § 313(a), 15 U.S.C. § 3373(a), provides that "[n]o price paid in any first sale of high-cost natural gas ... may be taken into account in applying any indefinite price escalator clause ... with respect to any first sale of any natural gas other than high-cost natural gas".  "High-cost natural gas" is defined as gas qualifying under NGPA § 107, 15 U.S.C. § 3317.

The parties agree that Item 3(c) is an "indefinite price escalator clause", as defined in NGPA § 105(b)(3)(B), 15 U.S.C. § 3315(b)(3)(B).  That item provides for calculating a new price basically by "taking the average ... of the three (3) highest prices per MMBtu for gas" being paid to other producers for similar gas in the four-parish area.  Item 3(e) provides that "[i]f any state or federal law, rule or regulation makes all or any portion of Item 3(c) ... illegal or inoperative, then in such event the

- 10 -

parties shall meet and mutually agree and determine the price for each respective anniversary date".

By the January 1985 letter (the 1/31/85 letter agreement), LIG stated to Goldking that NGPA § 313(a) made Item 3(c) inoperative, because the Item's formula includes the use of NGPA § 107 high-cost prices. Based on its interpretation of the effect of NGPA § 313(a), LIG proposed that the parties mutually agree to a proposed price for 1985, and redetermine it by mutual agreement "prior to the commencement of the next, and each succeeding, contract year". Within a month, Goldking executed and returned the 1/31/85 letter agreement. But, although Goldking agreed to accept the price for the remainder of 1985, it stated that it did "not wish to set a precedent of agreeing to a price for a full year term", and preferred "price redeterminations for terms shorter than one year".

According to LIG, the 1/31/85 letter reflects the parties' agreement that Item 3(e) would apply to post-1984 redeterminations. LIG maintains that, because the parties failed to mutually agree on a price after the last redetermination expired in November 1987, as required by Item 3(e), there was no contract for it to breach.

The Sellers counter that the 1/31/85 letter agreement applies only to Contract 493 (Goldking's separate contract with LIG), and not to theirs (Contract 495). In addition, concerning Item 3(e), they contend that NGPA § 313(a) did *not* render Item 3(c) illegal or inoperative, but merely prohibited the use of prices paid by other producers for high-cost/§ 107 gas in redetermining price. *See Pennzoil*, 645 F.2d at 377-78 ("Congress was ... aware of the use of

- 11 -

... indefinite price escalators in intrastate contracts, [and] it expressly limited the operation of price escalator clauses in four instances, thereby allowing escalator clauses to otherwise operate according to their terms").  Thus, according to the Sellers, they never agreed to operate under Item 3(e); therefore, the contract did not expire in late 1987 due to the parties' failure to agree on a price.  (They maintain that, instead, the redeterminations were pursuant to Item 3(d), as discussed *infra* in Part II.E.2.)

The 1/31/85 letter agreement refers only to Contract 493, between LIG and Goldking.  It does not reference Contract 495, the contract in issue.  Mealy (Goldking) testified that, for that reason, the Sellers were not given copies.  Likewise, Goldking's cover letter returning the executed 1/31/85 letter agreement references only Contract 493.

LIG attempted to prove -- and continues to assert -- that, despite the 1/31/85 letter referencing only Contract 493, it nevertheless applied to Contract 495.  LIG points out that, according to Speyrer's (Goldking) testimony, several pricing agreements which did not expressly reference Contract 495 were nevertheless intended and understood by the parties to apply to it. LIG further asserts that the parties' intent to operate under Item 3(e) is evidenced by their 21 price agreements, subsequent to the 1/31/85 letter, each of which established a mutually agreed price for a specific term, and required further mutual agreement to cover future periods.

The contract states that it "shall be in full force and effect for a term of twenty (20) years from initial delivery of gas hereunder", which occurred on May 23, 1978. In March 1988, LIG proposed that it be cancelled, effective December 31, 1987, and replaced with a new contract, but the Sellers refused.[6] Speyrer (Goldking) testified that Goldking did not receive a termination notice from LIG and that, to his knowledge, Contract 495 had not terminated or expired. Cantrell (EnCon) testified that no one at LIG had ever discussed with him the notion that the contract might have terminated, and that he had never received anything in writing from LIG indicating that it had. Moreover, LIG was still purchasing the Sellers' gas from the Field at the time of trial. Munro, LIG's corporate representative, testified that it is LIG's policy to purchase gas from producers only if there is a contract on file. He further testified that LIG had not written to the Sellers regarding its position that Contract 495 had terminated. Although Munro testified in his deposition that Contract 495 was still viable, he testified at trial that gas was not being purchased pursuant to that contract.

Ripple testified that when he left LIG's gas supply department in March 1989, Contract 495 had not been terminated. He testified further, however, that the gas was not being purchased pursuant to Contract 495. According to Ripple, there was no price in effect under Contract 495 when the last letter agreement expired in 1987.

---

[6] Goldking entered into a new contract with LIG effective January 1, 1988; thereafter, Contract 493 was inoperative.

Implicit in the jury's breach of contract verdict is a rejection of LIG's contentions that the 1/31/85 letter applied to Contract 495, that the price agreements after that date were governed by Item 3(e), and that the contract terminated in 1987. (The district court's denial of LIG's motion for JNOV, new trial, or remittitur on this verdict obviously reflects that it, too, rejected these contentions.)[7]  The evidence sufficiently supports these findings.[8]

## 2.  Declaratory Judgment/Specific Performance

As noted, the Sellers requested a declaratory judgment (enforceability of contract and price to be paid) and specific performance.  The district court denied both, stating that the

---

[7]    LIG contends that *Rutgers, State University v. Martin Woodlands Gas Co.*, 974 F.2d 659 (5th Cir. 1992), supports its position that the contract terminated.  We disagree.  The natural gas sales contract involved there provided that it would "continue in effect for five years ... and continue thereafter until canceled on thirty days prior written notice".  *Id*. at 660.  It specified a fixed price for the initial year, but provided that future prices were to be established by mutual agreement of the parties.  *Id*. But, it did not contain either a "mechanism by which price after the first year [could] be determined ... [or] language establishing ... a base or floor price to be used in the event the parties are unable to agree on another price".  *Id*. at 661.  Accordingly, the contract terminated at the end of the first year, when the parties failed to agree on a new price.  *Id*. at 662.

Contract 495 is easily distinguished from that in *Rutgers*. Item 3(a) contains a base price, and Items 3(b) and (c) furnish a mechanism by which a price can be determined.  Thus, unlike the *Rutgers* contract, Contract 495 "contains sufficient definitiveness to establish a price (and thus a contract)".  *Id*. at 661.

[8]    The Sellers contend that the district court abused its discretion by refusing to admit into evidence a "Confidential Offering Memorandum" developed by LIG's parent company in connection with its offer to sell LIG.  Because they offered it only for the purpose of rebutting LIG's termination contention, it is not necessary to address this issue.

Sellers had not met their burden of proof, and that "the remedies seem a generous extension, rather than inevitable implementation, of the jury's findings".

The Sellers contend that the requested relief should have been granted, because the court has a constitutional obligation to adopt a view of the case consistent with the jury's findings. According to them, declaratory relief would have settled, through one action, the controversy arising out of this contract, obviating the necessity of another over claimed continuing breaches.[9]

We review the denial of declaratory relief for abuse of discretion. *Sandefer Oil & Gas, Inc. v. Duhon*, 871 F.2d 526, 528 (5th Cir. 1989).

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

10A C. Wright, A. Miller & M. Kane, **Federal Practice & Procedure**, § 2759 at 647-48 (quoting Borchard, *Declaratory Judgments* 299 (2d ed. 1941)).

Specific performance is a "substantive right" under Louisiana law, and "is the preferred remedy for breach of contract". *J.*

---

[9] LIG does not contest the availability of specific performance or declaratory relief, but maintains instead that the district court's denial of those remedies constitutes a ruling on the merits that there is no contract -- a ruling which would preclude any future actions for breach. We reject this contention. Obviously, if the district court had accepted LIG's contract termination contention, it would not have upheld the verdict for breach subsequent to then.

*Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So. 2d 896, 897, 899 (La. 1981).  However, it "may be withheld by the court when specific relief is impossible, when the inconvenience or cost of performance is greatly disproportionate to the damages caused, when the obligee has no real interest in receiving performance, or when the latter would have a substantial negative effect on the interests of third parties".  *Id*. at 897.  We review the district court's interpretation of state law *de novo*.  *Salve Regina College v. Russell*, ___ U.S. ___, 111 S. Ct. 1217, 1221 (1991).

As discussed, although LIG has continuously purchased the gas subsequent to November 1987, it persists in claiming that the contract terminated then.  This continued insistence forms the basis for the Sellers' contention that they are entitled to declaratory relief.  We conclude that such relief would not serve the requisite useful purpose, because the jury's verdict and our affirmance of the denial of JNOV on breach conclusively refute LIG's termination contention.  Accordingly, the district court did not abuse its discretion in denying declaratory relief.

Nor did the Sellers meet their burden for specific performance.  The contract has a 20-year term and is scheduled to terminate in May 1998.  This litigation concerned breaches that occurred through the date of trial; and the Sellers were fully compensated, by damages, for them.  They failed to establish their entitlement to a remedy for breaches that have not yet occurred.[10]

---

[10]    *See* 4 **Corbin on Contracts** § 956 (contracts requiring continuing performance for a specified period are capable of a series of partial breaches) and § 954 (injured party may reasonably

- 16 -

## C. Prejudgment Interest

Article IX-A(a) of the contract provides that, "[i]f the correct amount is not paid within 10 days of the due date, interest on any unpaid amount shall accrue at the rate set as the prime rate by the First City National Bank in Houston, Texas, per annum...." The Sellers sought this prejudgment interest, calculated (prime rate) from the date each payment should have been made until the date of the verdict; but the district court granted only "legal" interest from the date of judicial demand until paid. The Sellers contend that the court erred in failing to award pre-judgment interest (1) for the period between the due date and judicial demand, and (2) at the correct rate.

In a diversity case, prejudgment interest is governed by state law. *Smith v. Industrial Constructors, Inc.*, 783 F.2d 1249, 1250 (5th Cir. 1986). And in Louisiana, "[w]hen the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties...." La. Civ. Code Ann. art. 2000.

---

expect performance of remainder of contract, and thus has option of treating non-performance as "partial" breach only, and getting judgment therefor without barring a later action for subsequent breaches) (1951 & Supp. 1992).

## 1.  Starting Date

The Sellers rely on ***Mini Togs Products, Inc. v. Wallace***, 513 So. 2d 867 (La. App. 2d Cir.), *writ denied*, 515 So. 2d 447, 451 (La. 1987), and ***City of New Orleans v. United Gas Pipe Line Co.***, 517 So. 2d 145 (La. App. 4th Cir. 1987), *cert. denied*, 488 U.S. 917 (1988).  In ***Mini Togs***, the court examined the Louisiana Supreme Court's decision in ***Alexander v. Burroughs Corp.***, 359 So. 2d 607 (La. 1978), and read it "as holding that a claim arising out of a contract, whether liquidated or not, bears legal interest from judicial demand or from such earlier date when the claim became ascertainable and due".  ***Id***. at 873.

> In using the term "ascertainable" the court did not mean that the precise amount of the claim need be liquidated or established without dispute in order for legal interest to commence in a contract claim.  In the *Alexander* case the amount of recovery was in dispute throughout with the amount awarded by the district court being changed by the court of appeal and then again by the supreme court.  What was meant was that a debt or claim for the payment of money or damages under a contract is ascertainable and becomes due on the date an active violation occurred or the obligor was put in default, which can be earlier but never later than judicial demand, and legal interest runs from that date.

***Id***.  In ***City of New Orleans***, the court pointed out that "[a] debt may be due before its amount is ascertained".  517 So. 2d at 164. However, it stated that "[t]he degree of difficulty of ascertaining ascertainable damages is not an obstacle to interest's running from their due date".  ***Id***.

LIG relies on ***Trans-Global Alloy Ltd. v. First Nat'l Bank of Jefferson Parish***, 583 So. 2d 443, 457-59 (La. 1991), in which the

- 18 -

Louisiana Supreme Court rejected the contention that interest should be awarded from a breach two and one-half years before suit was filed. *Id*. at 459. It distinguished other cases allowing prejudgment interest from the date of breach on the basis that, in those cases, "the amounts owed were both due and easily ascertainable on the dates from which interest was awarded". *Id*. In contrast, *Trans-Global* was a "highly complicated ... [case], in which three courts have had difficulty in determining whether there was a breach meriting compensation, and what the consequential damages of that breach should be". *Id*. Because the damages were not ascertainable at breach, the court held that prejudgment interest ran only from judicial demand. *Id*. LIG asserts that here, the debt, if due, was not ascertainable, because the Sellers presented several different damage scenarios to the jury.

The question is a close one. The damages were not ascertainable at breach. The price LIG would have paid was not established until the jury reached its verdict, calculating damages based on Items 3(b) and (c), as opposed to 3(a), 3(d) or 3(f). We conclude that prejudgment interest should run only from judicial demand. Accordingly, the district court did not err in refusing to award pre-judicial demand interest.

### 2. Rate

LIG does not contest the Sellers' contentions that the contract interest rate should apply. A schedule of that rate was introduced at trial. In addition, with its motion for entry of judgment, Concise provided calculations based on that rate.

Pursuant to La. Civ. Code art. 2000, the Sellers were entitled to prejudgment interest at the contract rate. Therefore, the district court erred in using the legal rate. Accordingly, we remand to recalculate prejudgment interest.

### D. LIG's Counterclaim

Item 3(f) provides that, if any state or federal law, rule, or regulation establishes a ceiling price for gas sold under the contract, the Sellers "shall receive the maximum price allowed by such law, rule or regulation". As noted, after the Natural Gas Policy Act was enacted in late 1978, Goldking claimed that, pursuant to Item 3(f), the Sellers were entitled to receive the maximum price. As also noted, after considering the matter for several months, LIG agreed.

LIG counterclaimed for overcharges against EnCon for 1979 through 1984; against Concise, June 1982 through 1984.[11] It contends that its counterclaim presents a pure question of law: whether the price exceeded the maximum allowed under NGPA § 105(b)(1). It asserts that the district court erred in submitting the issue to the jury over its objection, with erroneous instructions which did not include the applicable NGPA section, and that Item 3(f) is insufficient, as a matter of law, to entitle the Sellers to an increase.

NGPA § 105(b)(1) provides that the maximum lawful price for gas such as that from the Field is the lower of the price under the

---

[11] As to the refund, LIG took a nonsuit with prejudice against Austral.

- 20 -

then existing contract or the maximum lawful price for NGPA § 102 gas. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 406 (1983). Because the price under Contract 495 was lower than the § 102 price on the date of the enactment of the NGPA, LIG contends that "the *actual* price [Sellers were] receiving [on November 8, 1978] became the *maximum lawful* price [they] could receive." *Piney Woods Country Life School v. Shell Oil Co.*, 905 F.2d 840, 851 (5th Cir. 1990).

In its Order No. 23, the FERC stated, with respect to clauses such as Item 3(f), that "the parties may interpret such clauses (consistent with their terms) as providing contractual authority to escalate to applicable Natural Gas Policy Act statutory prices." *Fed. Energy Reg. Comm'n Rep.* (CCH) ¶ 30,040 at p. 30,317 (4-5-79). In discussing Order No. 23, our court stated in *Pennzoil* that area rate clauses, such as Item 3(f)

> are certainly ambiguous as applied to the collection of currently available [NGPA] ceiling rates for natural gas. A contract should be interpreted in light of the changed circumstances to accomplish what the parties intended.

645 F.2d at 383, 388.

We reject LIG's contention that its counterclaim should not have been presented to the jury. Under FERC Order No. 23 and *Pennzoil*, whether Item 3(f) authorized price escalation was dependent on the parties' intent. In August 1979, after considering (for nearly eight months) the Sellers' request for escalation under Item 3(f), LIG agreed that they were entitled to receive NGPA § 102 prices. Although LIG reminded the Sellers then

that the NGPA imposes an obligation to refund if it is eventually determined that the price paid exceeds the "maximum lawful ceiling price", it paid the § 102 prices until March 1983, and made no refund claim until 1990, during this litigation. Considering this evidence of LIG's belated change in its interpretation of Item 3(f), the jury reasonably could have concluded that the parties interpreted Item 3(f) to authorize escalation to the NGPA § 102 price.

### E. Jury Instructions/Interrogatories

### 1. LIG

LIG claims numerous errors in jury instructions and interrogatories. Most relate to the fraud claims; our affirmance of that JNOV obviates addressing them. With regard to breach, LIG maintains that it is entitled to a new trial, because the court did not instruct the jury on its affirmative defenses of estoppel, acquiescence, and waiver. It also contends that the court erred in instructing the jury that it could interpret unambiguous agreements, and could utilize equity in doing so. LIG maintains that the interrogatories were insufficient, because they did not include separate interrogatories for each of its affirmative defenses and as to each of the Sellers.

Needless to say, the district court has "broad discretion in formulating the jury charge". *Bradshaw v. Freightliner Corp.*, 937 F.2d 197, 200 (5th Cir. 1991).

> On appeal, the charge must be considered as a whole, and so long as the jury is not misled, prejudiced, or confused, and the charge is comprehensive and fundamentally accurate, it will

- 22 -

be deemed adequate and not reversible error. We review jury instructions with deference and will only reverse judgment when the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.

*Id*. (citations and quotations omitted). In instructing the jury, district judges may "select their own words and ... charge in their own styles". *Harrison v. Otis Elevator Co.*, 935 F.2d 714, 717 (5th Cir. 1991). "No harmful error is committed if the charge viewed as a whole correctly instructs the jury on the law, even though a portion is technically imperfect". *Id*. "[M]ere differences in form or emphasis in jury instructions do not constitute reversible error". *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 190 (5th Cir. 1991).

The standard of review for special interrogatories is summarized in *Barton's Disposal Service, Inc. v. Tiger Corp.*, 886 F.2d 1430 (5th Cir. 1989). We inquire

(i) whether, when read as a whole and in conjunction with the general charge the interrogatories adequately presented the contested issues to the jury; (ii) whether the submission of the issues to the jury was "fair"; and (iii) whether the "ultimate questions of fact" were clearly submitted to the jury.

*Id*. at 1435 (footnotes and citations omitted).

LIG's requested instruction on equitable estoppel was irrelevant to the breach claims for the period after November 1987. That instruction refers to the Sellers' knowledge of LIG's payment of higher prices to other producers during the period covered by the fraud claims (pre-December 1987). Even if it can be construed to cover the period after November 1987, the Sellers' ability to

discover the prices LIG was paying others is irrelevant to whether LIG breached the contract by refusing to furnish that information pursuant to Items 3(b) and (c).

The district court did not err in refusing the requested instructions on acquiescence and waiver, because LIG did not introduce evidence that the Sellers either acquiesced in LIG's refusal to comply with their repeated requests after November 1987 for price redetermination in accordance with Items 3(b) and (c), or waived any of their contractual rights during that period.

Even if the district court erroneously instructed the jury on contract interpretation, it is not reversible error. As reflected in the interrogatory, in reaching its verdict on the Sellers' breach of contract claims, the jury did not engage in contract interpretation. In any event, LIG's requested instructions included language similar to that about which it now complains.

It was not necessary to present separate interrogatories for each affirmative defense and as to each of the Sellers. We conclude that the instructions, when read in conjunction with the interrogatories, adequately presented the contested issues to the jury. In sum, we find no reversible error.

### 2. Sellers

As noted, the Sellers relied on two theories of recovery for the period March 1983 through November 1987: fraud and breach. The district court submitted an interrogatory only on fraud.[12]

---

[12] The Sellers requested one for breach, and objected to it being refused. Although LIG asserted in its briefs that the Sellers failed to preserve this issue for review, it conceded at oral

- 24 -

Having affirmed the JNOV on fraud, we must consider the Sellers' claim of reversible error because a breach interrogatory was not submitted.

We conclude that the error, if any, in refusing to submit it was harmless. As stated in Part II.A.2., *supra*, in the letter agreements between March 1983 and November 1987, the Sellers agreed to accept reduced prices in exchange for increased takes. The Sellers maintain that LIG's payment of higher prices to other producers during that period establishes a *prima facie* case of breach. We disagree. Their contention is correct only if the special price agreements were under Item 3(d) (the economic-out provision); if they were valid modifications of the contract for limited periods, it is incorrect. Our review of the record reveals insufficient evidence to support the former.

As LIG correctly notes, between March 1983 and November 1987, Item 3(d) was never mentioned in connection with any price discussion, nor in any document. Corcoran (LIG) testified that his goal was to reduce the price to market-clearing levels, and that Item 3(d) did not furnish a mechanism for that. Although LIG's requests for price concessions were based on market conditions, and Ripple, LIG's gas supply representative from March 1987 through March 1989, referred to the prices reflected in the letter agreements as "the LIG economic-out price", Mealy (Goldking) testified that he never tried to fit the agreements into any

---

argument that they were entitled to the interrogatory if the grant of a conditional new trial were affirmed.

particular part of Item 3. Carter (Goldking) testified that, although he did not recall specifically discussing Item 3(d) with LIG, he "understood" that LIG was exercising its rights under that provision. And, Cantrell (EnCon) likewise testified that he "believed" that LIG was operating under Item 3(d). He testified, however, that the Sellers could agree with LIG to change the price for a limited period of time, and when that time expired, the price would be governed by the contract. Likewise, Johnson (LIG) testified that the Sellers had a right to terminate the letter agreements, "which meant it would go back under the original terms of the contract". This evidence is insufficient to establish that LIG invoked Item 3(d).[13] Because the letter agreements were valid and governed the price from March 1983 through November 1987, the district court did not reversibly err in refusing to submit a breach interrogatory for that period.

### F. Damages

Launching numerous attacks against the bases for the Sellers' expert's opinion, LIG contends that they failed to introduce competent evidence to justify any contract damage award. We briefly discuss a few of these contentions and reject the remainder.

> In reviewing a jury award, we are actually, of course, reviewing the district court's denial of a motion for a new trial or remittitur. Because the district court has a wide range for discretion in acting on such motions, our standard of review is not simply right or wrong but abuse of discretion.

---

[13] We also note that, in the interrogatory, the jury awarded damages for fraud based on Items 3(b) and (c), not (d).

- 26 -

*Sam's Style Shop v. Cosmos Broadcasting Corp.*, 694 F.2d 998, 1006 (5th Cir. 1982). "[T]here is no such abuse of discretion unless there is a complete absence of evidence to support the verdict". *Id*.

The jury awarded damages based on the difference between prices LIG paid to the Sellers from December 1987 through trial (February 1991), and prices calculated pursuant to Items 3(b) and (c) for that period. The damages were based on the testimony of the Sellers' expert, John Brickhill. Item 3(c) provides that the redetermined price shall be the average of the three highest prices for gas of similar quality and pressure being paid by pipeline companies to producers in Terrebonne and contiguous parishes under contracts with terms of one year or longer.

LIG asserts that, to establish a price under Item 3(c), the Sellers were required to prove actual prices being paid on May 23 (Contract 495 production anniversary date) of each of the three years in question under contracts for gas that met the Item 3(c) requirements. This contention is based on a strained reading of that item. It does not require the use of prices being paid on May 23. Brickhill's testimony was based on prices actually paid near the time of the effective date of the redetermination, and his opinion was subjected to intense cross-examination on this point. He testified that the prices he used in his calculations were not suspended or subject to refund. In addition, the contracts Brickhill used were for a term in excess of one year. LIG's remaining contentions regarding the pressure, quality, and volume

of gas were also the subject of vigorous cross-examination, and go to the weight, rather than admissibility, of that evidence.

LIG also attacks Brickhill's reliance on purchased gas adjustment ("PGA") filings in reaching his opinion. PGAs are periodic filings by interstate gas pipelines which show the quantity of gas delivered to the pipeline over a period of time, the cost of gas incurred by the pipeline for that period, and cost and quantity projections for future periods. LIG contends that Brickhill's testimony and the PGAs were purely speculative and incompetent evidence for purposes of calculating damages under Item 3(c). It further contends that the PGAs were not admissible through the testimony of the Sellers' expert under Fed. R. Evid. 703, because they were not of a type reasonably relied upon by other experts in that particular field. According to LIG, Brickhill's mathematical method of dividing the volume of gas reported in a PGA into the total costs reported for that period does not provide the price the interstate pipeline paid to the various producers, and amounts to a guess.

LIG does not challenge Brickhill's qualifications to express an opinion, Fed. R. Evid. 702, but contends that the facts he relied upon are not of the same type as are relied upon by other experts in the field, Fed. R. Evid. 703, and that he did not use a well-founded methodology in reaching his conclusions. *See* ***Christophersen v. Allied Signal Corp.***, 939 F.2d 1106, 1111 (5th Cir. 1991) (*en banc*), *cert. denied*, ___ U.S. ___, 112 S. Ct. 1280 (1992). We disagree. In ***Christophersen***, we stated that, "[a]s a

- 28 -

general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration". *Id*. at 1109. This applies here. LIG's challenges were appropriate for resolution by the jury.

After careful consideration of LIG's numerous contentions, we conclude that there was competent, admissible evidence to support the damages.

### III.   CONCLUSION

We have reviewed all of the almost countless issues raised by the several parties; those not specifically addressed have been found to be without merit. The judgment of the district court is **AFFIRMED**, except with respect to the prejudgment interest award. The case is **REMANDED** for the limited purpose of recalculating it.

**AFFIRMED** in part; **REVERSED** and **REMANDED** in part.

3. <u>Price</u>:

(a) For all gas delivered to Buyer at any point of delivery, Buyer agrees to pay Seller two dollars and five cents ($2.05) per MMBtu during the period from initial delivery of gas under this agreement until the first anniversary thereof. This price, if not redetermined as provided for hereunder, shall escalate five cents (5.0¢) per MMBtu on the first anniversary of first delivery of gas and each anniversary thereafter.

(b) Seller has the option to cause the price to be paid by Buyer for Seller's gas delivered to be redetermined for the period beginning with the first anniversary of initial delivery of gas under this contract and additional such options annually thereafter during the term of this Contract. Such redetermined price shall become effective on the first day of the period for which it is determined and continue in effect until replaced by a subsequent price redetermination or escalate in the amount as provided in Item 3(a) above. Any request for a redetermination of prices shall be given in writing by Seller to Buyer not later than thirty (30) days nor more than one hundred twenty (120) days prior to the beginning of

the period for which a price redetermination is requested. Should such request not be given within such time, Seller's said option shall be deemed to have been waived by Seller for that redetermination date only.

(c) The redetermined price shall be the highest price of the following:

The price computed by taking the average (rounded off to the nearest one-hundreth of a cent) of the three (3) highest prices per MMBtu for gas being paid by pipeline companies to producers (including prices being paid by Buyer and including prices being received by Seller from other pipeline purchasers) under contracts covering the purchase of gas in Terrebonne Parish, and those parishes contiguous thereto, whose original terms are one (1) year or longer and which gas is of a pressure and quality similar to that available hereunder on the first (1st) day of the period for which a redetermination is being made; provided, however, any price being paid by an interstate company will not be used under this item to the extent that such price is suspended or subject to refund at the time of any such price redetermination hereunder. For

purposes of this contract, a pipeline company is defined as any company whose principal business is purchasing gas from producers in the field and transporting such gas through their pipeline facilities for resale.

(d) Notwithstanding, the foregoing provisions of this Item 3, if from time to time and at any time Buyer determines that economic conditions indicate a significant and evident downward change in the value to Buyer of gas purchased hereunder, Buyer is given the option to cause the price to be paid by Buyer for Seller's gas to be renegotiated for any price redetermination period above described; provided, however, that Buyer shall not have such right so long as Buyer is paying producers (located in Terrebonne Parish and parishes contiguous thereto for the purchase of gas similar to that being purchased hereunder) a price equal to or above the price being paid to Seller hereunder, and if renegotiated, such renegotiated price shall not be less than such prices then being paid by Buyer to such producers for similar gas in said geographical area. Any request for a renegotiation of prices shall be given in writing by Buyer to Seller not less than thirty (30) days, nor more than one

hundred twenty (120) days, prior to the beginning of the period for which a price renegotiation is requested hereunder. Buyer and Seller agree to negotiate in good faith on a renegotiated price which will reflect the economic conditions or burden on Buyer in effect relating to gas purchases as of the first (1st) day of the period for which a price renegotiation is being made. Such renegotiated price shall become effective on the first day of the period for which it is determined; provided, however, Seller may elect to terminate this Contract instead of selling gas to Buyer hereunder at such renegotiated price by giving ninety (90) days prior written notice thereof to Buyer anytime after the date such renegotiated price is determined; provided, however, deliveries continue at the last effective price on a day-to-day basis at Seller's option for a maximum of 60 days while Seller locates another market for said gas. If the renegotiated price is equal to that provided for above and in 3(c) above, then in such event, Seller shall not have the right to cancel this contract.

(e) If any state or federal law, rule or regulation makes all or any portion of Item 3(c) above illegal or inoperative, then in such event

the parties shall meet and mutually agree and determine the price for each respective anniversary date. Should the parties be unable to agree on such price within a sixty (60) day period from the effective date of such new price, then either party may terminate this Contract by giving the other party ninety (90) days prior written notice.

(f) Should any state or federal law, rule and regulation establish a ceiling price for the gas sold under this Contract, then in such event, Seller shall receive the maximum price allowed by such law, rule or regulation. It shall be the responsibility of Seller to notify Buyer of any such law, rule or regulation permitting a price higher than that being paid hereunder, and such new established price shall become effective on the effective date of such Federal law, rule or regulation, if Seller notifies Buyer within thirty (30) days after such effective date. If notice is not received by Buyer within (30) days of such effective date, then the price shall become effective upon receipt of Seller's notice by Buyer.