I,PEATROSS, J.
This breach of contract/tortious interference with a contract action arises out of a series of events that took place in early 2001. Plaintiffs-Appellees, Larry G. Culp and Cottonport Plaza, LLC (referred to collectively as “Cottonport”), sued Defendants-Appellants, Eagle’s Nest Church of Monroe, Louisiana (“Eagle’s Nest”) and George M. Fluitt, Jr. (“Mr. Fluitt, Jr.”), seeking damages for breach of a contractual right of first refusal and/or tortious interference with a contract. The trial court ruled in favor of Cottonport in the amount of $15,000 plus judicial interest, concluding that “... the right of first refusal was violated and interfered with in this action and the asserted ‘release’ is found to be incredible.” Eagle’s Nest and Mr. Fluitt, Jr. appealed. For the reasons stated herein, we affirm the judgment of the trial court in favor of Cottonport.

FACTS AND BACKGROUND

Eagle’s Nest is a 501(c)(3) non-profit corporation, whose president was Mr. Fluitt, Jr. Eagle’s Nest owned an entire city block in old downtown West Monroe, Louisiana, containing a church, administrative building, parsonage and a small white house. Cottonport was formed on March 17, 2000, by Mr. Culp and George M. Fluitt III (“Trey”), the son of Mr. Fluitt, Jr. On April 10, 2000, Mr. Fluitt, Jr., acting on behalf of Eagle’s Nest, executed an Agreement to Purchase and Sell the church and administrative building in favor of Cottonport. The agreement expressly excluded the other portions of the property, namely the parsonage and white house. Included in the above-styled agreement was the following clause:
[¡¡16. SELLER agrees that it will give PURCHASER the right of first refusal to purchase the property SELLER retains, more commonly referred to as the parsonage at a price not to exceed $95,000.00. The legal description of the parsonage is more particularly described on the attachment referred to as Exhibit ‘B.’[1]
This contractual language is the center of the dispute in the case sub judice.
Eagle’s Nest decided soon after executing the above contract to put the white house and parsonage up for sale (before any mention of the right of first refusal had been made). Mr. Fluitt, Jr. requested and received a letter dated February 6, 2001, from Trey, allegedly on behalf of Cottonport, declining to exercise the right of first refusal on the remainder of the property (the parsonage and white house). Trey testified that he and Mr. Culp had discussed the prospect of exercising or rejecting the right of first refusal and had come to a decision to reject it. Mr. Fluitt, *746 Jr. also testified that he had talked with Mr. Culp regarding the right of first refusal and that the latter had given a verbal waiver of the said right. In regard to the rejection and the accompanying February 6, 2001 letter, Trey testified in court as follows:
Q: And did you tell Mr. Culp about [the letter]?
A: Yes.
Q: When did you tell Mr. Culp about it?
A: Well, me and Larry had a couple of different conversations about it. And we both laughed or he laughed about the purchase price of ninety-five thousand dollars.
Q: Right.
| a A: And [Mr. Culp] says, there’s no way, it’s not worth that, because after you pay your property taxes and insurance, you’re looking at fifteen hundred dollars a month. At that point and time, I said well, [Mr. Fluitt, Jr.] is wanting a release. [Mr. Culp] says, well, give it to him. He won’t sell it. And after he tries to sell it for three or four months, then we’ll come back and make another offer, if we’re interested at that point and time.
Accordingly, Trey testified that he and his wife typed up the letter and delivered it to Mr. Fluitt, Jr. Subsequently, Eagle’s Nest had the white house listed for sale in the local newspaper in Monroe, Louisiana.[2]
Mr. Culp, however, testified that the above conversation never took place. He questions the credibility and timing of the letter and contends that he never saw it, nor had any idea that the right of first refusal had been waived until the deposition of Mr. Fluitt, Jr. Mr. Culp further denied ever being approached about purchasing the remaining property and states that he never orally or in writing waived the right of first refusal.
Alternatively, Mr. Culp asserts that Trey did not have the authority to effect a release on behalf of Cottonport[3] and that the aforementioned February 6, 2001 letter was “bogus.” The record, however, suggests that Trey ran the majority of the Cottonport renovation project, signed all of the leases (without Mr. Culp’s signature) and signed numerous checks for the project (also without Mr. Culp’s signature). Two witnesses testified that j4they dealt solely with Trey in negotiating and signing their lease with Cottonport.
The various parties also have differing beliefs as to what the right of first refusal actually meant. Mr. Culp, on behalf of Cottonport, asserted the right of first refusal simply functioned to tie up the remainder of the city block in the event that they decided to purchase it in the future. It was Mr. Culp’s understanding that, once it was tied up, and “when it was feasible or when [he] wanted to, or before anybody else could buy it, that [Eagle’s Nest] would have to come to [Cottonport] with a first right of refusal.” Trey stated that he believed the right of first refusal tied up the remainder of the city block as well; *747 and, if Eagle’s Nest chose to sell it, Cot-tonport would have the first opportunity to purchase it. Mr. Culp and Trey both testified that their understanding was that a third party offer was required before the right of first refusal could be exercised or declined.
Mr. Culp admits to having seen “For Sale” signs on or around the parsonage and white house. He further testified that he knew the white house had been listed for sale in the newspaper. Mr. Culp stated that he did not take issue with the signs or newspaper listing because he assumed Eagle’s Nest would have to approach him first (per the right of first refusal) if or when they found a ready and willing buyer.
In any event, Ms. Linda Ketchall (“Ms. Ketchall”) purchased the parsonage and white house on April 23, 2001, for $110,000. Ms. Ketchall testified that, after she had signed the purchase agreement with Eagle’s Nest, but before she had signed the deed to effect the purchase, she was | ^approached by Mr. Culp, who attempted to buy the white house from her. Ms. Ketchall further testified that she responded that she was not able to sell the white house because she had not yet acquired title to it. Thereafter, the transfer to Ms. Ketchall was concluded without any further mention to Mr. Culp or Cottonport.
Cottonport sued Eagle’s Nest for $15,000 in damages, representing the difference between the sale price ($110,000) and the stated right of first refusal price ($95,000), not for specific performance of the contract.[4] As stated previously, the trial court ruled in favor of Cottonport in the amount of $15,000 plus judicial interest on March 4, 2004, concluding that “... the right of first refusal was violated and interfered with in this action and the asserted ‘release’ is found to be incredible.” The trial court provided no further findings of fact or reasons for its ruling. This appeal ensued.

DISCUSSION

Standard of Review

It is well settled that a court of appeal may not set aside a trial court’s or jury’s finding of fact unless it is “clearly wrong”; and, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, et al., 549 So.2d 840 (La.1989), citing Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La.1973). See also; Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979); Davis v. Owen, 368 So.2d 1052 (La.1979); Cadiere v. West Gibson Products Co., Inc., 364 So.2d 998 (La.1978).
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court; but, if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that, had it *748 been sitting as the trier of fact, it would have weighed the evidence differently. Arceneaux, supra, citing Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
In applying the manifestly erroneous— clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial function is not to decide factual issues de novo. Rosell, supra.
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what can be said. Canter, supra, at 724; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987); Boulos v. Morrison, 503 So.2d 1 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999 (La.1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247 (La.1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300 (La.1979).
When the fact finder decides to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, supra, citing Jackson v. Tate, 428 So.2d 882 (La.App. 1st Cir.1983), citing McDonald v. Book, 215 So.2d 394 (La.App. 3d Cir.1968), overruled on other grounds, Celestine v. Hub City Motors, Inc., 327 So.2d 700 (La.App. 3d Cir.1976).
Before reversing the fact finder’s determination, the appellate court must review the entire record and conclude from it (1) that a reasonable factual basis does not exist for the fact finder’s conclusion and (2) that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Id.
The trial court, in the case sub judice, could have reasonably found Cot-tonport’s release to be “incredible” because, inter alia, of the fact that Trey is Mr. Fluitt, Jr.’s son and because the February 6, 2001 release letter did not appear until Mr. Fluitt, Jr.’s deposition. This finding is further buttressed by the conflicting testimony regarding the release letter and the alleged verbal release by Mr. Culp. These factors support the trial court’s Isfinding and make the conclusion a reasonable one based on his assessment of credibility in this case. Although there was sufficient evidence from which it could be inferred that an alternative conclusion could have been reached, we cannot say that there is insufficient evidence to support the conclusion that the trier of fact reached.

Specific Performance/Damages

For a breach of contract granting a right of first refusal, “specific performance is the appropriate remedy.” Robichaux v. Boutte, 492 So.2d 521 (La.App. 3d Cir.1986), writ denied, 496 So.2d 352 (La.1986), citing Price v. Town of Ruston, 171 La. 985, 132 So. 653 (1931); Crawford v. Deshotels, 359 So.2d 118 (La.1978); Terrell v. Messenger, 428 So.2d 1241 (La.App. 3d Cir.1983), writ denied 433 So.2d 709 (La.1983).
Further, Article 2625 states that:
*749 A party may agree that he will not sell a certain thing without first offering it to a certain person. The right given to the latter in such a case is a right of first refusal that may be enforced by specific performance. (Emphasis added.)
Eagle’s Nest points out that Mr. Culp admits to approaching Ms. Ketchall about purchasing the property from her, knew about the newspaper listings and saw “for sale” signs on the property. Accordingly, they argue that he knew about the sale prior to her closing and signing the deed. As such, they contend that the remedy of specific performance was readily available to him at that point and was the more appropriate remedy in this case. They point out that Cottonport waited until after the transaction with Ms. Ketchall was completed to sue for damages, not for the parsonage and white house (via specific performance). Eagle’s Nest argues, in turn, l9that Cottonport sued for $15,000 without offering any evidence as to damages or quantum thereof.
In support of this position, Eagle’s Nest points to Litvinoff, Louisiana Civil Law Treatise, The Law of Obligations, Quantum of Damages, 6 La. Civ. L. Treatise § 4.10, footnotes omitted, stating:
In sum, it is not enough for a plaintiff to show that his interest has been injured because of the defendant’s breach. He must also prove that there is some basis for the court to estimate how much that interest has been injured. That conclusion prevails in the Louisiana jurisprudence. In a case where a lessor was able to prove that the lessee had removed a number of fruit trees and some topsoil from the leased premises, but unable to show any elements that would allow an estimation of the amount or extent of the damage that the lessor had thereby sustained, the court refused reparation, asserting that the awarding of recovery to the lessor in such a case would be tantamount to allowing reparation of merely speculative damages. It is the plaintiffs burden, the court said, to prove with legal certainty every item of damages claimed. That burden must be borne by producing competent evidence that shows the extent of the damage, for which purpose a plaintiffs own uncorroborated personal estimate of the value of the loss is insufficient.
Eagle’s Nest argues that Cottonport did not prove, with legal certainty, any item of damages claimed as the record on appeal shows no competent evidence, other than Mr. Culp’s personal estimate of the value of his loss, based on the difference of the sale price and the price of‘Cottonport’s right of first refusal.
Cottonport’s brief did not address this issue in any detail, nor offer any insight in furtherance of this point.
As noted, the Civil Code states that the right given to the holder of a right of first refusal may be enforced by specific performance. This language indicates that specific performance is not the only remedy in such 11peases, i.e., damages are also available in certain situations, such as the case sub judice: In Concise Oil & Gas Partnership v. Louisiana Intrastate Gas Corp., 986 F.2d 1463 (1993), the Fifth Circuit Court of Appeals held that specific performance is a substantive right under the Louisiana law and is the preferred remedy for a breach of contract. The Fifth Circuit noted, however, that specific performance may be withheld by a court when specific relief is impossible; when inconvenience or cost of performance is impossible; when the obligee has no real interest in receiving performance or when the latter would have a substantial negative effect on the interests of third parties. Id.
*750 Further, this court, in Austin’s of Monroe, Inc. v. Brown,, 474 So.2d 1383 (La.App. 2d Cir.1985), held that a trial court acts within its discretion by denying specific performance which otherwise may be feasible, where the inconvenience of the performance outweighs damage to an obli-gee. Finally, in Amend v. McCabe, 94-332 (La.App. 3d Cir.1/4/95), 649 So.2d 1059, reversed on other ground, 95-0316 (La.1995), 652 So.2d 1298, the court stated that damages were available in lieu of specific performance when specific performance is impractical.
The above-stated jurisprudence establishes that specific performance is the preferred contractual remedy under Louisiana jurisprudence, but, where, as here, it is impractical to grant specific performance, damages are also available. The white house and parsonage covered by the right of first refusal have already been sold to a third party, making specific performance of said right no longer feasible. We find, therefore, that, at the time the suit |nwas filed, specific performance was not an appropriate remedy. For this reason, we find no error of law in awarding damages in this case.

CONCLUSION

For the reasons set forth herein, the judgment of the trial court is affirmed. Costs are assessed to Eagle’s Nest Church of Monroe, Louisiana.
AFFIRMED.
hMOORE, J., concurs with written reasons.

. Exhibit B referred to in the contract details a surveyor’s description of the land at issue. The surveyor’s description relates that the land at issue covers about .461 acres in West Monroe, Louisiana. Paragraph 16 of the contract, for whatever reason, makes no mention of the white house at issue. The Court, after an exhaustive reading of the transcripts and briefs, concluded that the white house was, in fact, meant to be included in this description. The parties did not make this an issue in the case sub judice.

. The newspaper advertisement in the record is from March 20, 2001, and only lists the white house for sale at a price of $89,000, with no mention of the parsonage.

. Mr. Culp based this argument on the fact that, while he and Trey were partners in Cot-tonport and each signed the Articles of Organization, Initial Report and the Operating Agreement on March 16, 2001, only Mr. Culp signed a resolution (on the same day) giving him sole authority to buy and sell real estate. Trey testified that he never saw this resolution. When asked to explain this anomaly, Mr. Culp's response was simply, "I had something to lose. Okay?” He further explained that Trey understood that only he (Mr. Culp) was able to enter into such transactions.

. The parties in the case sub judice did not raise any estoppel-based arguments in the trial court or on appeal, despite the fact that Cottonport waited until specific performance was no longer a viable option, i.e., after the property had already been sold to Ms. Ketc-hall and then sued for damages. In this regard, we find noteworthy that Mr. Culp, by his own admission, knew that the property in question was up for sale and chose to waive his right to specific performance in favor of suing for damages.