United States Court of Appeals,

Fifth Circuit.

No. 91–3615.

RUTGERS, the State University, Plaintiff–Appellee Cross–Appellant,

v.

MARTIN WOODLANDS GAS COMPANY and Martin Blue Ridge Gas Company, etc.,
Defendants–Appellants Cross–Appellees.

Oct. 13, 1992.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before JOLLY, and DUHÉ, Circuit Judges, and PARKER[1], District Judge.

ROBERT M. PARKER, District Judge:

Rutgers, the State University, (Rutgers) Appellee–Cross Appellant filed suit for declaratory judgment seeking a declaration that the November 14, 1985 contract between Rutgers and Martin Woodlands Gas Company (Martin Woodlands) was no longer in effect. Both parties sought damages, alleging that the opposing party had breached the contract. The Court below found that the contract had been modified from a five year contract to a month to month contract, and that Rutgers had breached the contract by failing to give thirty days advance notice of cancellation. The Court ordered Rutgers to pay damages calculated as the amount of profits defendants would have realized in a thirty day period. Both parties appealed. We reverse in part and affirm in part.

In 1985 changes in federal regulations allowed Rutgers to purchase natural gas from private sources at more competitive prices than they had been charged by public utilities in the past. Rutgers negotiated a contract with Martin Woodlands to supply natural gas to some of its heating plants. The Natural Gas Sales Agreement (hereinafter Contract) entered into by Rutgers and Martin Woodlands and later assigned by Martin Woodlands to co-defendant Martin Blue Ridge Gas Company (Martin Blue Ridge) provides that the laws of the state of Louisiana govern and control its construction.

[1]Chief Judge of the Eastern District of Texas, sitting by designation.

Under the heading *Term,* the contract provides, "this contract will continue in effect for five years ... and continue thereafter until canceled on thirty days prior written notice." We must reconcile this five year clause with price provisions set out later in the contract.

Because it is central to our analysis, the entire price provision is set out in full.

3. *Price:* For gas hereunder as measured on a dry basis at a pressure base of 14.65 psia, BUYER shall pay SELLER $2.305 per million British thermal units ("MMBtu") delivered into Texas Eastern Transmission Corporation in their transport Zone B, which shall be the price-location reference point hereunder. Should the Delivery Point be different from Zone B or should any of the transportation tariffs change between the point of delivery and BUYER's plant, the price shall be adjusted such that the actual net burner tip cost of $3.30 per MMBTU to Buyer shall remain the same. The Price will remain fixed for one year.

At the end of the initial year hereunder and annually thereafter the Price hereunder for the succeeding year shall have been agreed upon by BUYER and SELLER. It is agreed that said redetermined net burner-tip price shall not escalate more than ten percent for the second year hereunder. The price for the third year shall not increase more than fifteen percent of the second year Price; the fourth year Price not more than twenty percent over the third year Price; and the fifth year Price not more than twenty-five percent of the fourth year price. If less than the maximum allowed increase is hereafter agreed upon for a given year, the unused margin shall carry forward in computing the Price cap for future years.

At the end of the first contract year, the price of natural gas had decreased dramatically. The parties engaged in price negotiations, but were unable to reach an agreement for the second year price. In a September 28, 1987 letter from Rutgers to Martin Woodlands, Rutgers declined an offer made by Martin to continue the contract at $3.30 per MMBtu. Rutgers instead proposed, "To demonstrate our good faith we will make gas purchases at the $3.30 price on a month to month basis while we continue discussing future pricing, without prejudice to Rutgers' right to terminate our arrangement in the event we are unable to agree on price." Martin answered Rutgers' offer, but continued to deliver gas and accept payment of $3.30 per MMBtu through the second year and into the third year of the contract. Negotiations continued throughout this time. On January 10, 1989 Martin Woodlands assigned the contract to a sister company, Martin Blue Ridge without seeking or obtaining the consent of Rutgers to the assignment. Martin Blue Ridge delivered gas to Rutgers from the date of assignment to June 12, 1989, when Rutgers gave written notification of its termination of and refusal to accept further deliveries of gas.

In the Findings of Fact and Conclusions of Law, the Court below faced Rutgers' contention that the contract terminated at the end of the first contract year for failure of the parties to reach an agreement as to price, and was replaced by a month to month contract. The question of termination is never explicitly decided in the Findings of Facts and Conclusions of Law. However, a careful reading leads us to the conclusion that the Court below did not find that the contract terminated for failure to reach an agreement on a price at the end of the initial year. The Court recites the fact the contract provided for an initial price of $3.305 per MMBtu, and quotes the contract language requiring the parties to agree on a price each year after the initial year. The language imposing a cap on the price increases is referred to as an "escalator clause ... which allowed for upward adjustment in price, with agreement of the parties." The Court then went into a discussion of the facts and the law surrounding the question of modification, which culminated in a finding that the five year term was modified in September of 1987 to a month to month contract. In the Judgment, entered by the Court on the same day, the Court ordered that judgment on the main demand be entered in favor of Defendants, the Martin Companies. The main demand referred to is presumably the Rutgers' pleading for declaratory judgment that the contract had terminated.

Findings of fact shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52, Federal Rules of Civil Procedure. However, construction of a written instrument is normally a question of law and findings and conclusions of the trial court are not binding on the appellate court. *Rockwood and Co. v. Adams,* 486 F.2d 110 (10th Cir.1973). Under Louisiana law, when a contract is subject to interpretation from the four corners of the instrument, without necessity of extrinsic evidence, interpretation of the contract is a matter of law subject to *de novo* review. *Hunter v. Transamerica Occidental Life Ins. Co.,* 847 F.2d 1151, 1155 n. 5 (5th Cir.1988).

Pursuant to paragraph 12 of the contract, the interpretation of the contract is governed by Louisiana law. Louisiana statutory law provides that in order for there to be a binding contract of

sale, there must be agreement as to the thing sold, the price and consent of the parties to the sale. La.Civ.Code arts. 2439 and 2464; *Shell Oil Co. v. Texas Gas Transmission Corp.,* 210 So.2d 554 (La.App. 4th Cir.1968), *cert. denied,* 252 La. 847, 214 So.2d 165 (La.1968). The question for this Court to decide is whether the price provision contains sufficient definitiveness to establish a price (and thus a contract) after the end of the first year, absent an agreement of the parties. Appellant takes the position that the contract was for five years and provided a minimum price of $3.30 per MMBtu. Under this theory, agreement between the parties was required to increase the price within fixed ranges, but not to continue the existing price. Rutgers contends here, as it did below, that the contract provides a set price for the initial year only, and failure of the parties to reach an agreement in subsequent years results in a termination of the contract.

The price to be paid after the initial contract year under the original 1985 contract is not specified within the four corners of the agreement, the contract contains no mechanism by which price after the first year can be determined and, contrary to the Appellants' claim, the contract contains no language establishing $3.30 per MMBtu as a base or floor price to be used in the event the parties are unable to agree on another price.

The interpretation of a contract is the determination of the common intent of the parties. La.Civ.Code art. 2045. When the words of the contract are clear and unambiguous and lead to no absurd consequences, no further inquiry may be made into the parties' intent. *Id.* art. 2046. The fact that one party can, in hindsight, create a dispute about the meaning of a contractual provision does not render the provision ambiguous. The Court must give effect to the ordinary meaning of the words and may not create an ambiguity where none exists. *Esplanade Oil & Gas, Inc. v. Templeton Energy Income Corp.,* 889 F.2d 621 (5th Cir.1989). Much like this case, *Esplanade* involved the interpretation of a contract in hindsight, after a dramatic, unexpected drop in the price of oil. There, the parties had a letter agreement that established a price for the purchase of some oil properties, made contingent on the condition that there should occur no adverse material change to the

properties or the Seller's interest therein before the date of closing. The price of oil dropped between the date of the agreement and the date of closing. Neither party had anticipated such a drop or built protective language into the contract to insure against this contingency. The District Court found that no changes occurred in the Seller's right, title, or interest in the properties, or the condition of the properties, but then held that under the circumstances the "adverse material change to the properties" language reasonable encompassed a dramatic decline in the price of oil. The Fifth Circuit reversed, holding, "[Buyer's] attempt to pour new content into the language of [the] condition in an effort to avoid what market fluctuations caused to be an economically unwise business decision is unavailing." *Id.* at 624. See also, *Commercial Union Ins. Co. v. Advance Coating Co.,* 351 So.2d 1183, 1185 (La.1977).

The price provision provides a limit on increases only. The Martin Companies would have us imply that because the parties to the contract provided explicitly for a maximum allowable increase, that they meant to provide a floor price also. As a fallback position, the Martin Companies would have us declare the contract ambiguous and consider the intent of the parties concerning the lowest possible gas price under the contract. We hold that the contract is not ambiguous and that it does not expressly or impliedly limit potential negotiated price changes to price increases. As Appellants pointed out, no one expected dramatic decreases in gas prices when the contract was signed in 1985. Consequently, no floor was built into the contract, because the parties anticipated that increasing gas prices made that an unnecessary precaution. The parties failed to agree on a new price at the end of the first year of the contract. We find that the contract lapsed at that time.

Appellants urge that the language, "This agreement shall continue in effect for five years ... and continue thereafter until canceled on thirty (30) days prior written notice," precludes a finding that the contract terminated for lack of agreement at the end of the first year. Alternatively, they suggest that a five year contract with a one year price is inherently ambiguous and requires an examination of circumstances outside the document to determine the intent of the parties. On the

contrary, we find that the five year clause, like every other provision in the contract makes sense in the context of the total contract. The parties mutually agreed to preclude certain options in their relationship for five years (e.g. designation of delivery point, quality of product, assignment rights) while allowing for price renegotiations each year that could, of course, result in the termination of the whole relationship. Certainly, nothing absurd results from reading the contract as if the parties intended the plain meaning of the words they used.

The District Court held that the parties modified the original contract to a month to month contract in September of 1987, that Rutgers breached their duty to give thirty days written notice of cancellation, and awarded damages to the Martin Companies to compensate for this breach. Having found that the contract had lapsed at the end of the first year for lack of agreement on price, we now hold that the letter written almost a year later offering to buy gas on a month to month basis and the actions of the parties which followed that offer did not revive the original contract clause requiring thirty day prior written notice of cancellation. Therefore we find Rutgers is not liable to the Martin Companies for thirty days lost profits.

Both parties advance theories of how and when the opposition breached the contract. All alleged breaches occurred after November 14, 1986. We hold that none of the alleged breaches could amount to a breach of a contract that no longer existed.

We therefore REVERSE the District Court's Judgement in favor of Martin Woodland and Martin Blue Ridge, and hold that the contract was terminated on November 14, 1986. Further, we REVERSE the damage judgment entered in favor of Martin Woodlands and Martin Blue Ridge in the amount of thirteen thousand nine hundred and eighty three and no/100 dollars ($13,983.00). We AFFIRM the lower Court's holding that all other damages claimed by the parties are DENIED.