**REVISED, July 16, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-30408

_____


DAVIS OIL COMPANY,

                              Plaintiff-Appellant,

            VERSUS

            TS, INC.,

                              Defendant-Appellee.


_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
June 26, 1998


Before JONES and SMITH, Circuit Judges, and SHAW,[*] District Judge.

JERRY E. SMITH, Circuit Judge:


    Davis Oil Company ("Davis Oil") brought this Louisiana diversity suit seeking recovery of cleanup costs for an abandoned oil lease.  Finding error, we reverse and render judgment for the plaintiff.

_____

[*] District Judge of the Western District of Louisiana, sitting by designation.

I.

A.

The State of Louisiana granted Davis Oil an oil and gas lease for a certain portion of state land in 1976. State Lease 7027 contains a covenant by Davis Oil to clean and cap the area at the expiration of the lease term. By its terms, the lease would terminate automatically three months after production from the wells on the tract ceased.

In 1981, Davis Oil assigned 92.5% of the lease to HPC, Inc. ("HPC"), a subsidiary of Hiram-Walker-Gooderham-Worts, Ltd. ("HW-GW"). Davis Oil assigned the other 7.5% to ENI Oil & Gas Drilling Program 1976-A ("ENI"). The state mineral board approved the change in operator from Davis Oil to HPC.[1]

Davis Oil and HPC entered into a Purchase Agreement regarding State Lease 7027. This contract contains a clause in which HPC consents to be responsible for Davis Oil's obligations under the lease.[2] It is this clause that forms the basis for Davis Oil's

---

[1] State acknowledgment of operator change did not relieve Davis Oil of its cleanup obligations under the lease.

[2] The clause specifically reads:

Section 2.14 *Assumption of Certain Obligations.* Subject to the other provisions hereof, Buyer [HPC] agrees to assume and will pay, perform and discharge all obligations of Seller [Davis Oil] relating to the Properties to the extent such obligations (a) are attributable to the Properties, and (b) attributable to any time or period of time after the Effective Time, and (c) arise out of legally binding obligations to which the Properties are shown to be subject in the documents pursuant to which conveyances are made to Buyer hereunder, and (d) which are not the subjects of Title Defects

(continued...)

2

suit against the successor to HPC's oil and gas assetsSSTS, Inc.

HPC subsequently assigned its portion of the lease to its subsidiary, Home Petroleum Company. The change in operator was again approved by the state mineral board. In 1982, Home Petroleum Company and ENI assigned their respective interests to Davis Fuel, Inc. (an entity not affiliated with Davis Oil). Again, the state mineral board approved the change in operator. Davis Fuel, Inc., subsequently assigned its interest in the lease to Spartan Minerals, Inc. ("Spartan"), and the state mineral board approved the operator change. Spartan thereafter apportioned out its ownership of the lease while retaining its operator rights. In June 1985, production from the wells on the tract ceased, thereby triggering an expiration of the lease in September 1985.

Spartan failed to cap the wells or clean up the site when the lease expired. In 1992, the State of Louisiana summoned all listed operators[3] to a hearing to determine which should pay for cleanup.

---

(...continued)
> or breaches of any representation or warranty of Seller hereunder. Notwithstanding the foregoing, Buyer shall take title to the Properties subject only to such matters that relate specifically to the Properties and such matters shall not include any contractual arrangements personal to the Seller or any documents evidencing or securing any indebtedness of the Seller or of any predecessor in title to the Seller . . . .

*Davis Oil Co. v. TS, Inc.*, 962 F. Supp. 872, 885-86 (E.D. La. 1997) (quoting the Purchase Agreement).

[3] These included Davis Oil, HPC, Davis Fuel, Inc., and Spartan.

3

Only Davis Oil appeared.[4]  Thereafter, the state assessed Davis Oil with the entire cleanup cost.  Davis Oil now seeks to enforce its Purchase Agreement with HPC by means of this suit against the successor to HPC's oil and gas assets, TS, Inc.[5]

B.

In 1988, TS, Inc., assumed HPC's assets and certain of its obligations as a result of a larger arrangement between both companies' parents (thereby becoming, for our purposes, "TS/Home"SSsee note 7 below).  HPC was a subsidiary of HW-GW, which, in turn, was a subsidiary of Hiram Walker Resources ("HR"), a Canadian liquor company.

TS, Inc., is a subsidiary of Gulf Canada Corporation ("Gulf Canada"), which bought HR and made it one of its subsidiaries.  As part of its restructuring following the acquisition of HR, Gulf Canada wished to divest HR of HW-GW.  Gulf Canada, therefore, sold HW-GW to Allied-Lyons, PLC ("Allied-Lyons"), which, however, was interested only in the liquor businessesSSand not the oil and gas businessesSSof HW-GW and its subsidiary, HPC, and HPC's subsidiary, Home Petroleum Company.

_____

[4] HPC was dissolved after its asset sale to TS, Inc.  Davis Fuel, Inc., and Spartan are otherwise defunct or insolvent.

[5] To recover, Davis Oil must show that TS, Inc., assumed HPC's Purchase Agreement obligations pursuant to the assumption agreements between TS, Inc., and HPC.  The relevant agreements concerning the assumption are the Option Agreement, the Memorandum of Understanding, and the Sale Agreement.  These are discussed more fully below.  *See infra* parts III-VI.

4

Consequently, as part of its deal to sell HW-GW, Gulf Canada gave Allied-Lyons an irrevocable put option in the form of the Option Agreement. Within a certain amount of time after Allied-Lyons acquired HW-GW, it could sell the oil and gas businesses of HPC and of HPC's subsidiaries back to Gulf Canada or to Gulf Canada's designated subsidiary.

Before the time to exercise the option had expired, Allied-Lyons and Gulf Canada entered into a "Memorandum of Understanding" that served to notify Gulf Canada that Allied-Lyons was exercising its option. The Memorandum of Understanding designates TS, Inc., as the Gulf Canada subsidiary to assume HPC's oil and gas businesses.

TS, Inc., and HPC thereafter, entered into a Sale Agreement.[6] When it assumed HPC's oil and gas businesses, TS, Inc., changed its name to Home Petroleum Company. A few years later, it returned to the name TS, Inc.[7]

C.

The parties submitted to the district court a stipulated record with their trial briefs. The district court granted judgment for the defendant and issued an opinion containing

---

[6] To facilitate the sale, HPC merged with its subsidiary, Home Petroleum Company, contemporaneously with this transaction; HPC was the surviving entity.

[7] For ease of explanation, we will refer to the company that assumed the assets of HPC as "TS/Home" rather than TS, Inc., or Home Petroleum Company.

findings of fact and conclusions of law. *See Davis Oil Co. v. TS, Inc.*, 962 F. Supp. 872 (E.D. La. 1997).

## II.

"[C]onstruction of a written instrument is normally a question of law and findings and conclusions of the trial court are not binding on the appellate court." *Rutgers, State Univ. v. Martin Woodlands Gas Co.*, 974 F.2d 659, 661 (5th Cir. 1992) (citation omitted). We review the district court's factual findings for clear error. *See id.*

"Whether there is a 'plain meaning' to a contract or whether an ambiguity exists is a legal question also subject to *de novo* interpretation." *See Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996) (citation omitted). "Under Louisiana law, a contract is ambiguous when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." *Id.* (citation omitted). Once the district court considers parol evidence, we review its factual findings based thereon for clear error. *See American Druggists Ins. Co. v. Henry Contracting, Inc.*, 505 So. 2d 734, 737 (La. App. 3d Cir.), *writ denied*, 511 So. 2d 1156 (La. 1987).

## III.

6

Davis Oil seeks to enforce HPC's lease cleanup obligations against HPC's successor, TS/Home.  To do so, Davis Oil must show that the relevant assumption agreements between HPC and TS/Home made TS/Home liable to Davis Oil for the State Lease 7027 obligations for which HPC was responsible under the Purchase Agreement.

As a threshold matter, TS/Home argues that even if it is responsible for HPC's Purchase Agreement obligations, the choice of law clause in the Option Agreement[8] between the parent companies of HPC and TS/Home prevents Davis Oil from suing TS/Home directly, rather than suing HPC and then making HPC seek recovery from TS/Home.  TS/Home represents that Ontario law, the law adopted in the Option Agreement, requires strict privity for suits to enforce contracts.  Intended third-party beneficiaries are unable to sue to enforce a contract if they are not parties to the original agreement.

Davis Oil was not a party to the assumption agreements between HPC and TS/Home and is thus only a third-party beneficiary of HPC's delegation[9] of its State Lease 7027 obligations to TS/Home.

---

[8] The Option Agreement is the agreement in which Gulf Canada granted Allied-Lyons the option to sell HPC's oil and gas assets and obligations to Gulf Canada.

[9] An explanation of our terminology might be helpful:  "At the outset, it is vital to distinguish the *assignment of rights* from the *delegation of performance of duties*.  An obligee's transfer of a contract right is known as an assignment of the right. . . .  An obligor's empowering of another to perform the obligor's duty is known as a *delegation* of the performance of that duty."  FARNSWORTH ON CONTRACTS § 11.1, at 778 (2d ed. 1990) (emphasis in original).

Arguing that a party's contractual choice of law binds an intended beneficiary as well as the parties, *see Barzda v. Quality Courts Motel, Inc.*, 386 F.2d 417, 418 (5th Cir. 1967) (per curiam) (construing Florida law), TS/Home maintains that we should dismiss this action.

## A.

Our research reveals that TS/Home's representations about Ontario's privity requirement may not be entirely representative of the modern view that the Ontario courts are taking of the issue. Although Ontario courts continue to adhere strictly to the common law privity of contract requirement, we have found that some have recently begun to carve more exceptions to that ruleSSincluding one for third-party beneficiaries of contract.

The General Division of the Ontario Court recently cited a case of the Supreme Court of Canada for the following proposition:

> The common law rule of privity of contract provides that a contract cannot confer rights or impose obligations on anyone except the parties to it. However, the rule is relaxed in appropriate circumstances, including that of third-party beneficiaries. *London Drugs Ltd. v. Kuehne & Nagel Int'l Ltd.* [1992] 3 SCR 299 [Can. Supr. Ct.].

*Evanov v. Burlington Broad. Inc.*, 1997 Ont. C.J. LEXIS 964 (Ont. Gen. Div.). If the emerging Ontario law indeed would permit plaintiff's suit in this instance, then the choice of law issue becomes moot. Ontario law and Louisiana law would not be in conflict and thus we could proceed to employ the forum's law. *See*

8

*infra* note 14.

B.

Even assuming that Ontario law does require strict privity of contract for this third-party beneficiary, Gulf Canada and Allied-Lyons did not intend, by their stipulation of Ontario law in the Option Agreement, for that choice of law to apply to *the transfer* of HPC's assets and liabilities. TS/Home argues that Ontario law controls the Sale Agreement because, in its view, the Option Agreement adopts Ontario law as the governing law for the interpretation of all of the transfer agreements. In our view, however, the parties meant their choice of law solely to govern the manner in which *the option* was exercised and construed.[10]

The Option Agreement is a contract that bound Gulf Canada, a Canadian corporation, headquartered in Toronto, Ontario, to buy the oil and gas businesses of HPC. That agreement required HPC to notify Gulf Canada by a written instrument delivered to Gulf Canada in Toronto.

Logically, Gulf CanadaSSthe party granting the optionSSwanted to make sure that it knew how that option would be exercised by the option holder. Because of the great differences in laws among jurisdictions concerning the construction of option contracts, the

---

[10] Note that unlike other provisions in the Option Agreement, the choice of law provision appears only in that agreement and is not repeated in the later Memorandum of Understanding or in the Sale AgreementSSthe two documents actually setting forth the details of the asset and obligation transfer.

9

parties likely intended to increase certainty by choosing the local law of the option makerSSGulf Canada.

The nexus with Ontario apparent in the Option Agreement does not also appear to exist in the Sale Agreement. In the latter agreement, HPC, a Delaware Corporation headquartered in Denver, Colorado, sold its oil and gas obligations to TS, Inc., a Georgia Corporation. The assets and obligations transferred were located in both the United States and Canada. There is no apparent justification to find that the parties wanted Ontario law to govern this transfer aspect of their agreement.

Even if HPC and TS/Home intended Ontario law to govern the transfer part of their dealSSin addition to how the option would be exercisedSSthe parties do not appear to have meant that choice of law to adopt a privity requirement. It would be peculiar if the parties effected the purpose of the Option AgreementSSHW-GW's clean break from the oil and gas businessesSSby requiring HPC (HW-GW's subsidiary) to stand in as the defendant for any and all failures of TS/Home to perform its obligations to HPC's oil and gas obligees.[11] This argument is especially weak given the fact that HPC was dissolved soon after the asset sale.

If Ontario law does not govern this aspect of the transfer

---

[11] HPC would then have to seek reimbursement from TS/Home under the assumption agreements. It is still true that unless HPC obtained novations from its obligees, it too could be held liable for any and all defaults by TS/Home. Without allowing obligees, as third party beneficiaries, to sue TS/Home directly, however, suing HPC would be the *only* avenue for such suits.

10

agreements, we might wonder which jurisdiction's law does apply. We do not need to conduct a conflict of laws analysis, however, because all of the possible jurisdictions whose laws might apply[12] do not require the (assumed) strict privity of contract of Ontario.[13] There being no conflict of laws with the forum's laws, we can proceed to apply Louisiana law.[14]

IV.

A.

1.

TS/Home argues that even under Louisiana law, an implicit assumption of HPC's indemnification obligation is not sufficient for the obligee to bring an action against the delegate under LA. CIV. CODE art. 1821. TS/Home maintains that because we have held that an indemnification agreement is a personal obligation under

---

[12] These include Colorado, Delaware, Georgia, and Louisiana.

[13] *See, e.g.*, LA. CIV. CODE ANN. art. 1821; *Montezuma Plumbing & Heating, Inc. v. Housing Auth.*, 651 P.2d 426, 428 (Colo. Ct. App. 1982); *Pierce v. International Ins. Co.*, 671 A.2d 1361, 1364 (Del. 1996); *Lincoln Land Co. v. Palfery*, 203 S.E.2d 597, 605 (Ga. Ct. App. 1973).

Although, in the final analysis, there may be yet another state that might be found to have a more significant relationship with the transfer agreements between HPC and TS/Home, mostSSif not allSSAmerican jurisdictions have long since abandoned privity as an absolute bar to third-party beneficiaries suing on a contract. *See* FARNSWORTH ON CONTRACTS § 11.11, at 831 (2d ed. 1990).

[14] *See* LA CIV. CODE ANN. art. 3537 (West 1994). Under art. 3537, "an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its laws were not applied to that issue." In this case, however, because all of the interested states' laws are fairly similar, none would be "most seriously impaired" if not applied. Therefore, we can apply the forum law without fear of conflict.

11

Louisiana law, *see Joslyn Mfg. Co. v. Koppers Co., Inc.*, 40 F.3d

750, 756 (5th Cir. 1994), the assumption of the obligation here

must be made with a specific contractual provision. *See id.*

> Louisiana law is settled that for there to be a
> *stipulation pour autrui* there must be not only a third-
> party advantage, but the benefit derived from the
> contract by the third party may not merely be incidental
> to the contract. Rather, the third-party benefit must
> form the condition or the consideration of the contract
> in order for it to be a *stipulation pour autrui*.
> Moreover, a *stipulation pour autrui* will be found only
> when the contract *clearly* contemplates the benefit to the
> third person as its condition or consideration.[15]

TS/Home maintains that this "clearly contemplates" language means

that the assumption must be made by an explicit reference to the

assumed obligation in the written assumption agreement.

As the district court correctly concluded, and assuming that

this agreement fits within the confines of the *Joslyn* rule,

Louisiana law does not go so far as to require explicit reference

---

[15] *Chevron, U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1147 (5th Cir. 1993) (quoting *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 467 (5th Cir. 1984) (en banc) (internal quotations and citations omitted) ("*NOPSI*")).

In *NOPSI*, we stated the relevant rule for understanding the instant case:

> *Where the promisor's performance is to be made to, and is subject to the control of, the promisee*, the Louisiana courts have refused to find a *stipulation pour autrui* despite the fact that the promisor and promisee may have contemplated that the promisor's performance would as a practical matter enable or facilitate the promisee's performance of its obligations to a third party.

*NOPSI*, 732 F.2d at 468 (citations omitted) (emphasis added). In the present case, the delegation was not "to be made to" and was not "subject to the control of the promisee." Quite the contrary. Unlike, for example, the letter of credit contract at issue in *Chevron*, here, HPC, as promisee, exercised no control once the agreement was signed; it could not have, because it ceased to exist.

to the individual, assumed obligation.[16]  Rather, state law requires that it must be apparent from the face of the document assuming the obligation that "the contract clearly contemplates the benefit to the third person as its condition or consideration."  *Chevron*, 987 F.2d at 1147.  That is, the party must be an *intended* third-party beneficiary, rather than an *incidental* one.  Consequently, we must look to the language of the assumption agreements between TS/Home and HPC to determine whether these parties "clearly contemplated," as the basis for their bargain, TS/Home's assumption of HPC's cleanup obligations under the Purchase Agreement.

2.

Before turning to the language of the contracts, however, we respond to the serious charges leveled by the dissent.  We conclude below that, under our caselaw construing art. 1821, the relevant portions of this labyrinth of contractsSSthe Sale Agreement, which refers to the Memorandum of Understanding, which in turn refers to the Option AgreementSS"clearly contemplate" TS/Home's assumption of HPC's obligation to clean up the site.[17]  Thus, we find TS/Home

---

[16] *See Davis Oil*, 962 F. Supp. at 882 ("[T]he reasoning of *Chevron* and *Joslyn* simply cannot support the sweeping prohibition against general assumptions that defendant advocates.").

[17] As the district court noted, there is also a subsidiary question whether § 2.14 of the Purchase Agreement between Davis Oil and HPC "clearly contemplated" HPC's assumption of Davis Oil's obligation to the state for cleanup costs.  For the reasons stated by the district court, we agree that HPC did assume Davis Oil's cleanup obligations under State Lease 7027 in the Purchase Agreement.  *See*
(continued...)

13

directly liable to Davis Oil for HPC's cleanup obligation.

The dissent stridently disagrees, as it finds this case "indistinguishable" from *Chevron*. Thus, the best place to start, it would seem, is with *Chevron* itself.

In that case, Traillour had an obligation to Chevron and secured a "side agreement" with the Rocky Mountain investors by which the investors promised Traillour a letter of credit for it to fulfill its obligation to Chevron. In order to seek satisfaction of the obligation from Traillour, Chevron attempted to bypass Traillour by suing the Rocky Mountain investors directly. We rejected Chevron's attempt to do so, stating:

> We think that the district court, by finding an unambiguous intent to confer a benefit on Chevron, *misread the purpose* of the side agreement between Rocky Mountain and Traillour. From the face of the agreement, there is no clear manifestation of an intent by Rocky Mountain to confer a benefit on Chevron. *Instead, the side agreement indicates that the letter of credit Rocky Mountain agreed to obtain was to be "made available for the benefit of Traillour at the closing of the purchase of the Bayou of Couba Field."* It is undisputed that Traillour, at the time it entered the side agreement with Rocky Mountain, had agreed to keep in force a letter of credit in favor of Chevron; however, it is also undisputed that Chevron, in the letter accepting Traillour's offer to purchase the Bayou Couba lease, expressly conditioned the sale on Traillour and Marsh's "acquisition of a $2,000,000.00 performance bond or irrevocable letter of credit." Therefore, *Rocky Mountain's agreement to obtain the initial letter of credit helped Traillour fulfill a condition precedent to Chevron's obligation to assign the Bayou Couba lease*. Finally, the recital in the side agreement, on which the

(...continued)
*Davis Oil*, 962 F. Supp. at 885-87.

> district court placed heavy reliance in finding an intent to benefit Chevron, simply does not reveal a clear intent to benefit Chevron. *The recital, like the provisions of the side agreement itself, reveals Rocky Mountain's intent to help Traillour close the deal with Chevron. Any benefit derived by Chevron from this side agreement was, in our view, merely incidental.*

*Chevron*, 987 F.2d at 1147-48 (some emphasis added).

*Chevron* involved a contract in which the promisor provided a continuing and directed benefit to the *promisee*, while not providing such a benefit to the third-party beneficiary. We quite rationally used the above-mentioned factors to determine that the promisor and promisee expected that the contractual obligations would remain between the two. *See id.* (noting that the contract did not intend to confer continuing benefits on the third-party beneficiary).

The instant contract, by contrast, is noticeably different from the one in *Chevron*. The instant parties inserted no comparable language that this contract is "for the benefit of HPC." Although HPC undoubtedly benefited from the assumption agreement, its benefit was non-exclusive and finite.

But there is a more important distinction. Here, the benefit to HPC's oil and gas creditors is continuous and contemplated: TS/Home, through its assumptions, undertook to step into HPC's shoes in running its oil and gas business. Indeed, TS/Home changed its name to HPC and undertook to be HPC itself. Far from being "indistinguishable" from *Chevron* then, this case appears to be

15

*terra nova*.

The argument advanced by TS/Home and the dissent for the *extension* of the *stipulation pour autrui* argument beyond that outlined in *Chevron* is logically flawed; it proves too much under the facts of this case. Their argument is as follows: Even if the defendant did assume this obligation, it was merely an incidental assumption, as it was not assumed through explicit contractual language. Therefore, Davis Oil must recover from HPC and not from TS/Home directly.

Although superficially attractive, this argument does not logically square with the structure of the deal between TS/Home and HPC. The reasoning of TS/Home and the dissent also applies to all of the day-to-day obligations assumed through the general, rather than explicit, contractual language. Therefore, under this reasoning, TS/Home (even though it is running HPC's oil and gas businesses) apparently cannot be sued by most, if any, creditors of HPC's assumed oil and gas businesses. A consequence of this is that Allied-Lyons *must* have agreed that it, or one of its subsidiaries, would be a *necessary* stand-in to HPC's obligees when TS/Home failed to meet its assumed obligations.

That is peculiar, though, in light of the only reason for the deal in the first place: Allied-Lyons intendedSSthrough its having and use of an irrevocable put optionSSto rid itself entirely of all of HPC's oil and gas business. The put option, after all, was

16

meant *to sell back* to Gulf Canada (through TS/Home) the obligations it already owned before the larger deal between the two parents took place.  Indeed, far from an unanticipated obligation for the defendant, this obligation was once owned by the defendant's parent, Gulf Canada, then sold to Allied-Lyons with an irrevocable put option to sell it back to Gulf Canada.  Accordingly, it makes more sense, under the structure of the deal, to conclude that TS/Home intended to make itself *directly* liable to obligees on HPC's obligations it re-assumed.

Although we can readily understand why TS/Home chooses to make this untenable argument, the dissent's adoption of it is less easy to comprehend.  The dissent's apparent failure to understand the larger components of the deal between Allied-Lyons and Gulf Canada reflects an evident concern about the development of the law of third-party beneficiaries.

The dissent apparently worries about (1) the equity to defendants in environmental cleanups and (2) the possibility that our ruling will open the flood gates to new liability actions in this area.  Although we find these concerns commendable, we cannot accept the dissent's desire to use its desired policy results "[to] work[] backward from [its] desired 'equitable' result to the legal principle that achieves [its] goal."[18]  Dissent at 1.  In sum,

---

[18] As for the dissent's "parade of horribles" (*e.g.*, tax collectors, "roustabouts" and the like), its fears might have been allayed had it looked beyond the language of the Sale Agreement to the limiting language in the

(continued...)

17

because TS/Home agreed to assume this obligation *to Davis Oil*, it must be accountable for it now.

B.

We now turn to the language of the assumption agreements at issue. In the Sale Agreement, TS/Home assumes four types of HPC's liabilities:

> And for the same [$100.00 and other good and valuable] consideration, *Assignee* [TS/Home] *hereby assumes*, subject to the Option Agreement and Memorandum of Understanding, the following obligations and liabilities:
>
> 1. All obligations of Assignor to deliver oil, gas or other minerals pursuant to any balancing agreement, gas purchase agreement or other agreement to compensate any party for any previous over-production by Assignor or for any "take or pay" or other advance payment;
>
> 2. *All obligations and liabilities of Assignor at the Effective Date that have arisen in the ordinary course of its business;*
>
> 3. All obligations to past or present employees of Assignor in respect of accrued pay and salaries, commissions, vacation and holiday pay, workman's compensation levies, statutory and other withholding deductions, other payroll deductions including union dues and pension plan contributions; and
>
> 4. All liabilities and obligations under equipment (including, without limitation, data processing) or real property leases or licenses or contracts therein entered into by HPC in the ordinary course of business.

---

(...continued)
Memorandum of Understanding and in the Option Agreement to which the Sale Agreement refers and to the Purchase Agreement.

18

Sale Agreement (emphasis added), *cited in Davis Oil*, 962 F. Supp. at 882. The district court correctly found that HPC's cleanup obligations under the Purchase Agreement arose in the ordinary course of business before the effective date, thus falling within the scope of paragraph 2.[19]

The district court, however, found that TS/Home had not assumed HPC's cleanup obligations, because the obligations fell within one of the Sale Agreement's exceptions to the aforementioned assumed obligations. The exclusionary language at issue reads as follows:

> Except to the extent *expressly assumed or required to be assumed pursuant to this Assignment, the Option Agreement or the Memorandum of Understanding,* the liabilities assumed by Assignee hereunder shall not include, and Assignee shall not assume or in any way be liable or responsible for (a) any liability or obligation of any kind incurred by or on behalf of Assignor after the Effective Date (b) *any liability or obligation which*

---

[19] For essentially the same reasons outlined by the district court, *see Davis Oil*, 962 F. Supp. at 884-85, we agree that this obligation arose in the ordinary course of business prior to the closing date of December 15, 1988. State Lease 7027 provided for its own expiration three months after oil and gas production from the leased tract ceased. Once the lease expired, the obligation to cap the wells and clean the site "arose." No demand was required for the obligation to accrue.

Production ceased on the land covered by State Lease 7027 in June 1985. As a result, the lease automatically expired in September 1985. At that time, Davis Oil's contractual obligation under the lease agreement became due. Under the Purchase Agreement transferring Davis Oil's interest in the lease to HPC, HPC also became obliged to clean up the site at that time.

In the district court, Davis Oil also argued that paragraph 4 of the Sale Agreement assumed this obligation because it was an obligation from a "real property lease." The district court rejected this contention, stating that "it is evident from other provisions in the Sale Agreement that when the parties referred to oil and gas leases they used the term 'oil and gas leases.'" *Davis Oil*, 962 F. Supp. at 883. Davis Oil does not raise this argument on appeal and we, as a consequence, do not address it.

> *may in the future be asserted against Assignee arising out of, resulting from or in connection with, Assignor's operation of its business* and (c) any liability or obligation of any kind to any shareholder of Assignor to any corporation, entity or person related to or affiliated with such a shareholder.

Sale Agreement (emphasis added), *cited in Davis Oil*, 962 F. Supp. at 887. Specifically, the district court held that the cleanup obligations did not meet exception (b) because, although they arose prior to December 15, 1988, they were not asserted against TS/Home until approximately four years after the closing date.[20] *See Davis Oil*, 962 F. Supp. at 888.

The exclusionary language in the Sale Agreement starts with the phrase "Except to the extent expressly assumed or required to be assumed pursuant to this Assignment, the Option Agreement or the Memorandum of Understanding . . . ." Sale Agreement, *cited in Davis Oil*, 962 F. Supp. at 887. Although we agree with the district court's interpretation that the Option Agreement does not require assumption, the court's interpretation of the Memorandum of Understanding is flawed, and that document does indeed require TS/Home's assumption of HPC's obligation to Davis Oil. Accordingly, the exceptions of the Sale Agreement are not applicable.

---

[20] We need not consider the propriety of the district court's reading of the exclusionary prongs in the Sale Agreement, because we find this obligation expressly assumed by the Memorandum of Understanding. *See infra* part VI.

V.

Davis Oil argues that the Option Agreement plainly contemplates TS/Home's acquisition of this liability. It points to the following definition of "Oil and Gas Assets and Liabilities" that the Option Agreement adopts:

> [T]hose assets and liabilities of HW-GW and its subsidiaries (excluding any Consolidated Indebtedness but including, without limitation, assets and liabilities of HPC Inc.) *habitually designated as part of the oil and gas division of such corporations*, which assets and liabilities as at August 31, 1985 were those set forth in Schedule D annexed hereto.[21]

Davis Oil maintains that the emphasized language shows that Allied-Lyons intended to rid itself of *all* oil and gas assets and liabilities, notwithstanding what the specific provisions of the Memorandum of Understanding and the Sale Agreement might state.

Because, however, the Option Agreement only outlines the *possible* range of things Allied-Lyons could sell to Gulf Canada, we must look to the Memorandum of Understanding and the Sale Agreement to determine what the parties *actually did* transfer. By itself, the Option Agreement determines only the frontier. The Memorandum of Understanding and the Sale Agreement, by contrast, hammer out the details of the eventual transfer.

---

[21] Supplemental Share Purchase Agreement (emphasis added). The Option Agreement adopts its definition of Oil and Gas Assets and Liabilities from the "Restated Agreement," which includes the Supplemental Share Purchase Agreement. The aforementioned definition of Oil and Gas Assets in the Supplemental Share Purchase Agreement also contains a reference to "Schedule D." That appendix, however, contains only aggregate monetary estimates of the values of the assets and liabilities to be assumed.

Davis Oil contends that the Memorandum of Understanding shows that the parties meant to have Gulf Canada§§through TS/Home§§assume the entire scope of the assets and liabilities defined in the Option Agreement.  Specifically, Davis Oil points to the following in the Memorandum of Understanding:

> *Without limiting the provisions* of the [Option] Agreement or the foregoing provisions hereof but subject as hereinafter provided in this Section (m), the following liabilities shall be part of the Oil and Gas Assets and Liabilities:
>
> > (i)   except as contemplated herein, all obligations and liabilities of HPC and its subsidiaries at Closing, whether or not contingent, that have arisen in the ordinary course of the oil and gas business of HPC or any of its subsidiaries *carried on with the Oil and Gas Assets and Liabilities;*
> >
> > * * *
> >
> > (iv) except as contemplated herein, all liabilities and obligations accruing or falling due after closing, whether or not contingent, in relation to the oil and gas business theretofore conducted by HPC or any of its subsidiaries *carried on with the Oil and Gas Assets and Liabilities*.

Memorandum of Understanding (emphasis added), *cited in part in Davis Oil*, 962 F. Supp. at 888-89.

A.

The district court found that the above-quoted passage from the Memorandum of Understanding requires that the liabilities

22

assumed be tied to an asset forming part of the "Oil and Gas Assets and Liabilities" at closing. Reading the words "business . . . carried on with the Oil and Gas Assets and Liabilities" as "business carried on with *the assets forming part of* the Oil and Gas Assets and Liabilities," *Davis Oil*, 962 F. Supp. at 889 (emphasis added), the court concluded that the obligation under State Lease 7027 could not possibly have been assumed. HPC had sold its interests in State Lease 7027 well before the closing date; HPC's obligations to Davis Oil with regard to State Lease 7027 were not tied to an identifiable asset forming part of the Oil and Gas Assets and Liabilities at closing. Thus, HPC's obligation to Davis Oil under the Purchase Agreement fell outside the obligations that TS/Home assumed in the Memorandum of Understanding.[22]

The district court dismissed the idea that "the obligation in question relates to business carried on with the liabilities constituting the Oil and Gas Assets and Liabilities," because the argument was "circular and le[d] nowhere." *Davis Oil*, 962 F. Supp. at 889. "In essence, the argument would be that the obligation in question falls within the subsection (i) or (iv) because it meets the requirements of that subsection if the last phrase is ignored."

---

[22] Because we decline to adopt the district court's reading of a presently existing asset requirement in § (m) of the Memorandum of Understanding, we need not address Davis Oil's contention that because of a defective title transfer, HPC still legally owned its interest in State Lease 7027 on December 15, 1988. Accordingly, we express no view on the matter.

*Id.* The court's reasoning is troublesome for the reasons that we outline below.

B.

The district court's reading of a presently existing asset requirement into § (m)(i) and (m)(iv) is strained in light of the language of the Option AgreementSSan agreement to which § (m) specifically refers.[23] Even though the court had reason to be suspicious of Davis Oil's reading of the phrase "business . . . carried on with the Oil and Gas Assets and Liabilities," its own alternative similarly lacks force.

At bottom, the district court reads into the contract a requirement that the liabilities assumed in this section be tied to an identifiable asset assumed at closing. This requirement has the effect of excluding a great deal of general oil and gas obligationsSSones that the spirit of the transfer agreements would seem to encompass.[24]

---

[23] The district court never discussed the phrase "*without limiting the provisions of the [Option Agreement]*" that appears before the specific exclusions mentioned thereafter. As Davis Oil correctly notes, this phrase is important, because it shows that the parties intended the Option Agreement's expansive definition of Oil and Gas Assets and Liabilities to play a role in the Memorandum of Understanding. Thus, when reading the more specific passages of § (m)(i) and (m)(iv), we should keep in mind the language initially adopted by the Option Agreement.

[24] The district court's insertion of a "related asset" requirement seems especially tenuous when, in another part of the same subsection of the Memorandum of Understanding, the drafters used that phrase when they meant to include such a requirement:

(continued...)

24

We note that it was HR that originally owned HPC and Home Petroleum Company through HR's subsidiary, HW-GW. When HR was acquired by Gulf Canada, the deal was to sell HW-GW but to retain HW-GW's oil and gas holdings. Thus, there is good reason to believe that TS/Home§§the designated subsidiary of Gulf Canada§§did in fact intend to assume HPC's general oil and gas obligations§§including those untied to a "related asset." These obligations were originally Gulf Canada's§§by way of HR§§to begin with. As a basis for the bargain of selling HW-GW, Gulf Canada agreed *to keep* its oil and gas obligations.

## C.

The better view of the phrase "Oil and Gas Assets and Liabilities" in § (m) is to read it in conjunction with the Option Agreement. After all, this section of the Memorandum of Understanding starts with the admonition: "Without limiting the

---

(...continued)

> For greater certainty, the following liabilities of HPC shall not constitute a portion of the Oil and Gas Assets and Liabilities and shall not be assumed by Gulf:

> (1)    liabilities to any affiliate of HPC (other than to a subsidiary of HPC where *the related asset* is also included as part of the Oil and Gas Assets and Liabilities and other than liabilities to affiliates arising in connection with bona fide transactions entered into in the ordinary course of the oil and gas business carried on by HPC or its subsidiaries with the Oil and Gas Assets and Liabilities) . . . .

Memorandum of Understanding, § (m) (emphasis added). Note that the contract drafters included the "related asset" requirement explicitly in one instance, and then immediately afterward§§in the same sentence§§did not; instead the drafters used the same phrasing that they used in subsections (i) and (iv).

25

provisions of the [Option] Agreement . . . ."  Accordingly, if we insert the Option Agreement's definition of "Oil and Gas Assets and Liabilities" for that phrase in § (m), we reach a more congruent result.

Here is how the relevant subsections of § (m) would read if we inserted the Option Agreement's definition of "Oil and Gas Assets and Liabilities" for that phrase:

> *Without limiting the provisions* of the [Option] Agreement or the foregoing provisions hereof but subject as hereinafter provided in this Section (m), the following liabilities shall be part of the Oil and Gas Assets and Liabilities:
>
> > (i)  except as contemplated herein, all obligations and liabilities of HPC and its subsidiaries at Closing, whether or not contingent, that have arisen in the ordinary course of the oil and gas business of HPC or any of its subsidiaries carried on with *those assets . . . habitually designated as part of the oil and gas division of such corporations*.
> >
> > * * *
> >
> > (iv) except as contemplated herein, all liabilities and obligations accruing or falling due after closing, whether or not contingent, in relation to the oil and gas business theretofore conducted by HPC or any of its subsidiaries carried on with *those assets . . . habitually designated as part of the oil and gas division of such corporations*.

The use of the Option Agreement's "assets . . . habitually designated as part of the oil and gas division of such corporations" extricates us from the vicious circle of trying to define the liabilities forming the "Oil and Gas Assets and

26

Liabilities" by self-referencing to the assets forming part of the "Oil and Gas Assets and Liabilities." Instead, if we use an external definitionSSwhich seems to adopt a common understanding of the partiesSSthings start to make more sense.

Under this reading, an assumed liability can outlive an asset. The liability need only be one incurred with assets thatSSat some point in timeSSwere "habitually designated as part of the oil and gas division of" HPC or Home Petroleum Company. HPC's obligations incurred as a result of its assumption of State Lease 7027 plainly meet this standard.

## VII.

Because the Memorandum of Understanding expressly assumes the obligation that HPC incurred under the Purchase Agreement, the exclusions in the Sale Agreement do not apply. The district court therefore erred in finding that TS/Home did not assume Davis Oil's cleanup obligation under State Lease 7027. Accordingly, we REVERSE and RENDER judgment for Davis Oil.

By EDITH H. JONES, Dissenting:

With due respect to the panel majority, I must dissent from the improbable result in this case. The majority hold,

27

overruling the district court, that TS/Home, which acquired oil and gas assets of HPC in a transnational corporate reorganization in 1988, also acquired environmental cleanup obligations pertaining to a lease that HPC had sold to another party in 1982. In other words, the corporate reorganization transaction somehow revived a liability that had been shed by HPC for all practical purposes six years earlier. The majority accomplishes this Phoenix-like resurrection of liability by misconstruing Louisiana's law concerning a *stipulation pour autrui*, or in the common law, a third party beneficiary contract.[25] The majority cites the applicable law but evidently does not understand what it means and misconstrues the application of that law in a recent carefully considered decision of our own court. See <u>Chevron v. Traillour Oil Co</u>., 987 F.2d 1138 (5th Cir. 1993).

Putting the facts in perspective, it appears that the majority has worked backward from a desired "equitable" result to the legal principle that achieves their goal. Davis, the plaintiff here, acquired State Lease 7027 from Louisiana in 1975 and assigned its interest in the lease to HPC in 1981.[26] Eighteen months later, HPC conveyed State Lease 7027 to another company. Several

[25]*See* Louisiana Civil Code Art. 1821 ("An obligor and a third person may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be in writing.").

[26]HPC and Home Petroleum are related entities, but the intracorporate dealings are unnecessary to relate here.

intervening conveyances occurred until in 1985, production from the lease ceased.  The last operator apparently failed to plug and abandon the wells as required by the terms of the lease.

In 1988, pursuant to a much larger transaction between Canadian liquor companies, HPC transferred its oil and gas assets to TS, Inc., which became TS/Home, the target defendant here.  HPC later dissolved.

The state caught up with the status of Lease 7027 in 1991 and began looking for parties to hold liable for the clean-up costs.  The state fastened its gaze on Davis Oil, which naturally began to seek others in the chain of title who could contribute to the clean-up costs.  HPC no longer existed, and several other transferees were apparently defunct, so Davis went after TS/Home. Davis alleged (1) that HPC, Inc. originally had a contractual obligation to indemnify Davis Oil for plugging and abandoning operations on State Lease 7027 and (2) that TS/Home assumed HPC's obligation to Davis Oil in the assignment transaction that occurred in 1988.  Lacking any direct contractual relationship with TS or any of the subsequent owners of Lease 7027, Davis has to prove itself an obligee of the HPC-TS/Home transaction.[27]

Davis has persuaded the majority that when TS/Home

_____

[27]Davis makes no argument against TS/Home founded on § 128 of the Louisiana Mineral Code.  La. Rev. Stat. Ann. § 31:128 (West 1998); *see also*  Chevron, 987 F.2d at 1158 (construing § 128).  I will not speculate on any such claim.

29

acquired hundreds of oil and gas properties in the United States and Canada from HPC in the 1988 reorganization, it also voluntarily assumed the obligation to clean up Lease 7027 in Louisiana on a property that HPC had sold and divested itself of six years earlier. That any rational business would voluntarily assume such remote liabilities defies common sense. Not surprisingly, the imposition of liability under these circumstances also defies Louisiana's law. Louisiana does not readily permit a third-party stranger to a contract to enforce its provisions against one of the contracting parties. As this court has put it in an en banc opinion, a third-party beneficiary provision in Louisiana requires the following: that "the benefit derived form the contract by the third party may not be merely incidental to the contract;" that "the third-party benefit must form 'the condition or consideration' of the contract in order to be a *stipulation pour autrui;*" and that the provision will be found "only when the contract *clearly* contemplates the benefit to the third person as its 'condition or consideration.'" New Orleans Pub. Serv., Inc. v. United Gas Pipeline Co., 732 F.2d 452, 467-68 (5th Cir. 1984) (en banc). Louisiana law requires either that there be an express declaration of intent to benefit the third party "or an extremely strong implication." Id.

        Nothing in the contractual provisions laboriously construed by the majority "clearly contemplates" any benefit to

third parties as remote to the corporate reorganization of HPC and TS/Home as the clean-up costs for wells that had stopped producing three years after HPC sold them and three years before the corporate reorganization occurred. This particular obligation could not have been a known potential claim in the context of the 1988 transaction, because although the wells had stopped producing in 1985, the state's claim for environmental cleanup costs was first asserted in 1991, three years <u>after</u> the transaction here at issue. Indeed, because HPC had sold its interest in 1982, how could it possibly have known that, after several intervening transfers, the wells would cease production without proper plugging and abandoning three years later?

In a strikingly similar case, this court exhaustively considered Louisiana's law of *stipulation pour autrui* and ruled against the party in Davis's position. See <u>Chevron v. Traillour Oil Co</u>., 987 F.2d 1138 (5th Cir. 1993). <u>Chevron</u> makes it clear that in Louisiana, a *stipulation pour autrui* "is never presumed. Rather, the intent of the contracting parties to stipulate a benefit in favor of a third party must be made manifestly clear." *Id*. at 1147 (internal citation omitted). In <u>Chevron</u>, the court held that when Traillour, which purchased Chevron's interest in an oil field, re-assigned that interest to Rocky Mountain, conditioning Rocky Mountain's performance on providing a letter of credit (which Chevron required) to secure the plugging and

31

abandoning of the wells, that was not a third-party beneficiary provision in favor of Chevron. Rocky Mountain executed a contract to benefit only Traillour, the court held, and this benefit could not flow back to Chevron directly. The Chevron opinion also holds that remote investors in the field, who purchased from Traillour and assumed "all obligations" resulting from their ownership of the conveyed interests, did not execute a *stipulation pour autrui* on behalf of Chevron. Their contract with Traillour did not clearly contemplate a benefit to Chevron as its condition or consideration. See id. at 1159-60.[28]

        This analysis appears to me dispositive of the present situation, where any "intent to benefit" Davis was much more vague and inspecific than the language Chevron dealt with. There was far more equity in Chevron's position than there is in this case, because Chevron clearly contemplated and sought to avoid the possibility that Traillour might not be able to bear the costs of plugging and abandoning the wells. Here, by contrast, neither TS/Home nor HPC had any conception at the time of the 1988 reorganization either that Lease 7027, which HPC no longer owned, had ceased production without proper environmental controls or that

---

[28]Neither this case nor Chevron deals expressly with the liabilities of owners in the lease's chain of title to the original lessor for cleanup costs. Any such obligation would be a real obligation, whereas the intermediate owners' liability on indemnity provisions is a personal obligation under Louisiana law. See Chevron, 987 F.2d at 1149.

32

Davis Oil lurked in the shadows, waiting to pounce on TS/Home after having been itself mugged by the Lease 7027 plug and abandonment costs. It is illogical for this later panel to hold that there was a clear intent to benefit Davis Oil in this case after our court has concluded that no intent to benefit Chevron existed in the prior case.

The majority fails to adequately distinguish <u>Chevron</u>, yet as a prior precedent of this Court construing Louisiana law, it is dispositive. <u>See, e.g.</u>, <u>Batts v. Tow-Motor Forklift Co.</u>, 978 F.2d 1386, 1393 (5th Cir. 1992). The majority also fails to deal with the wealth of Louisiana caselaw, summarized in the accompanying footnote, that narrowly construes the doctrine of *stipulation pour autrui*.[29]

---

[29]The following is a sample of cases in which either the Louisiana courts or this court sitting in diversity has examined Louisiana third party beneficiary law:

*Liquid Drill, Inc. v. U.S. Turnkey*, 48 F.3d 927 (5th Cir. 1995) (holding that a stipulation pour autrui did not exist even though a drilling contract provided that the contracting party was to be "solely responsible and assumes all liability for all consequences of operations by both parties while on a day work basis, including results and all other risks or liabilities incurred in or incident to such operations"); *Dartez v. Dixon*, 502 So.2d 163 (La. 1987) (finding stipulation pour autrui where benefit to third party "was not merely incidental to the agreement but was a calculated and essential part of the negotiations" between the parties); *Broussard v. Northcott Exploration Co.*, 481 So.2d 125 (La. 1986) (holding that mineral lease did not create a stipulation pour autrui despite the fact that the lessee assumed responsibility for "all surface damages"); *Hargroder v. Columbia Gulf Transmission Co.*, 290 So.2d 874 (La. 1974) (finding stipulation pour autrui only
(continued...)

33

The majority's rough-and-ready decision to diffuse liability for clean-up costs may well have consequences far beyond the incorrect result reached here. As the preceding discussion of <u>Chevron</u> and Louisiana law demonstrate, contract law generally does not lightly presuppose that strangers to a contract may enforce the contract in court. The potential for confusion and inconsistency ought to be obvious. Suppose, for instance that a local tax assessor decided, years after HPC had sold its interest in Lease

---

[29](...continued)
after concluding that the servitude agreement "contain[ed] no restriction as to beneficiaries"); *Andrepont v. Acadia Drilling Co.*, 231 So.2d 347 (La. 1969) (finding stipulation pour autrui where the contracting parties modified their lease to expand liability beyond damages to the lessor); *Oswalt v. Irby Const. Co.*, 424 So.2d 348, 354 (La. App. 1982) (holding that agreement of grantee in right-of-way deed, where grantor reserved right to grow crops in right-of-way, to pay grantor for any future damage to crops on submittal of bill by grantor, was not stipulation pour autrui in favor of grantor's lessee); *Logan v. Hollier*, 424 So.2d 1279 (La. Ct. App. 1982) (holding that a stipulation pour autrui did not exist despite insurance policy language which provided that when "the amount of ultimate loss becomes certain, the company will, upon request of the insured, make such payment to claimant on behalf of the insured"); *Crowley v. Hermitage Health & Life Ins. Co.*, 391 So.2d 53 (La. App. 1980) (holding that health and accident insurance policy in which employer is insured, providing for benefits in the event of employee work-related injury to be paid to employer or persons furnishing services to employee, is not stipulation pour autrui in favor of employee injured on job); *HMC Mgmt. Corp. v. New Orleans Basketball Club*, 375 So.2d 700 (La. Ct. App. 1979) (holding that lease agreement did not clearly contemplate any intention to benefit third party "as it was simply an agreement between two entities for their mutual benefit"); *Hertz Equip. Rental Corp. v. Homer Knost Constr. Co.*, 273 So.2d 685 (La. Ct. App. 1973) (holding that insurance contract did not create a stipulation pour autrui because it did not "purport to name the third party as an insured").

7027, that HPC had underpaid local school taxes.  Suppose, as another example, that a roustabout who once worked for HPC on Lease 7027 sues a third-party who seeks contribution from HPC on the theory that plaintiff's real injury occurred during his employment by HPC.  Under the majority's rule, either of these parties could now sue TS/Home directly, even though no claim had been made before HPC sold its interest in Lease 7027 or even before the 1988 reorganization.[30]  Suppose, as another complication, that HPC was still in business, having sold only its "oil and gas" assets to TS/Home but retained other properties.  Could the plaintiffs <u>still</u> sue TS/Home?  Because the potential liabilities are obviously endless, and because reasonable expectations of contracting parties are thwarted when a stranger can sue to "enforce" their deal, no case in Louisiana construes a general assumption of liabilities clause in a contract as a *stipulation pour autrui*.[31]  I hope this

---

[30]It goes without saying that such plaintiffs could sue HPC. And if HPC had become defunct without properly accounting for potential known claims, state law affords remedies, *e.g.*, by means of fraudulent conveyance law.  This case has no such allegations, and the only question is whether plaintiffs unknown to the contracting parties will now have two potential defendants.

[31]The maxim never say never is useful in law as in life.  Thus, I would not contend that no assumption of liabilities provision in a complex corporate reorganization or acquisition will ever result in a *stipulation pour autrui,* a  provision in favor of a third party.  Boilerplate language like that included here, however, is likely to characterize such provisions and falls far short of showing that the benefit to a specific third party was contemplated as part of the transaction's condition or consideration.  *See* <u>New Orleans Pub. Serv.</u>, 732  F.2d at 467-78.

is the last case ever to do so.